[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-11535
_____

D.C. Docket No. 1:04-cv-02669-IPJ

DERRICK ANTHONY DEBRUCE,

Petitioner - Appellant,

versus

COMMISSIONER, ALABAMA DEPARTMENT OF CORRECTIONS,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(July 15, 2014)

Before TJOFLAT, WILSON and MARTIN, Circuit Judges.

WILSON, Circuit Judge:

Derrick Anthony DeBruce, an inmate on Alabama's death row, appeals the district court's denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his death sentence.  DeBruce contends that he received ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution in both the guilt and the penalty phases of his capital murder trial.

DeBruce was convicted of fatally shooting a customer during the robbery of an AutoZone store which he committed with five other men.[1]  DeBruce argues that his retained trial attorney, Erskine Mathis, was constitutionally ineffective in failing to cross-examine state witness LuJuan McCants, a co-participant in the robbery who identified DeBruce as the shooter at trial, with McCants's earlier allegedly contradictory statements.  He also argues that Mathis was ineffective in failing to investigate and present evidence about DeBruce's mental capacity and background during the penalty phase of his trial.[2]

---

[1] *See* Ala. Code § 13A-5-40(a)(2) (proscribing capital murder in the course of a robbery). The Alabama Court of Criminal Appeals noted that all five of DeBruce's codefendants were charged with capital murder, and that LuJuan McCants was the only defendant to whom Alabama offered a plea agreement and reduced sentence.  *See DeBruce v. State*, 890 So. 2d 1068, 1074 n.1 (Ala. Crim. App. 2004).  The apparent ringleader of the robbery, Charles Lee Burton, was convicted of capital murder and sentenced to death.  *See Burton v. State*, 651 So. 2d 641 (Ala. Crim App. 1993).  The record does not indicate the disposition of the charges against the other three defendants.

[2] On collateral review, the Alabama Court of Criminal Appeals denied DeBruce relief as to his ineffective assistance of counsel claims, *DeBruce*, 890 So. 2d at 1074, and the Alabama Supreme Court denied DeBruce's petition for certiorari.  *Ex Parte DeBruce*, No. 1030617 (Ala. Apr. 30, 2004).

2

I.

A district court's grant or denial of a habeas corpus petition is reviewed *de novo*. *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010).   Because DeBruce filed his federal petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  *See Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1345 (11th Cir. 2011). Where, as here, a state court has denied an ineffective assistance of counsel claim on the merits, the standard a petitioner must meet to warrant federal habeas relief "was intended to be, and is, a difficult one." *Johnson v. Sec'y, DOC*, 643 F.3d 907, 910 (11th Cir. 2011) (citing *Harrington v. Richter*, ___U.S.___, ___, 131 S. Ct. 770, 786 (2011)).

AEDPA allows federal courts to grant habeas relief only if the state court's resolution of those claims:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established Supreme Court precedent in either of two respects: (1) "if the state court applies a rule that

3

contradicts the governing law set forth in [Supreme Court] cases," or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Williams v. Taylor*, 529 U.S. 362, 405–06 , 120 S. Ct. 1495, 1519–20 (2000).   To determine whether a state court decision is an "unreasonable application" of clearly established federal law, we are mindful that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410, 120 S. Ct. at 1522.   "A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland*[3] standard itself." *Richter*, 131 S. Ct. at 785 (footnote added).   As a result, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* at 786 (quotation marks omitted).

In addition, a state court's factual determination is entitled to a presumption of correctness.  28 U.S.C. § 2254(e)(1).  AEDPA's "statutory presumption of correctness applies only to findings of fact made by the state court, not to mixed determinations of law and fact." *Parker v. Head*, 244 F.3d 831, 836 (11th Cir. 2001).  Ineffective assistance of counsel claims present mixed questions of law and fact not entitled to a presumption of correctness. *See Cade v. Haley*, 222 F.3d

---

[3]   *Stickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984).

4

1298, 1302 (11th Cir. 2000) (stating *Strickland*'s deficient performance and prejudice prongs "present mixed questions of law and fact reviewed *de novo* on appeal"). Under 28 U.S.C. § 2254(e)(1), we must presume the state court's factual findings to be correct unless the petitioner rebuts that presumption by clear and convincing evidence. *See id.* § 2254(e)(1); *Parker*, 244 F.3d at 835–36. Although the Supreme Court has "not defined the precise relationship between § 2254(d)(2) and § 2254(e)(1)," *Burt v. Titlow*, ___ U.S.___, ___, 134 S. Ct. 10, 15 (2013), it has emphasized "that a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Id.* (quoting *Wood v. Allen*, 558 U.S. 290, 301, 130 S. Ct. 841, 849 (2010)).

If we determine that the state court's adjudication of DeBruce's *Strickland* claims was unreasonable under § 2254(d), we must then undertake a *de novo* review of the record. *See McGahee v. Ala. Dep't of Corr.*, 560 F.3d 1252, 1266 (11th Cir. 2009).

To establish that his counsel provided constitutionally ineffective assistance, DeBruce must show both that his counsel's performance was deficient and that the deficiency prejudiced his defense. *See Strickland*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064. Deficient performance for purposes of the Sixth Amendment is representation which falls "below an objective standard of reasonableness"

5

measured by prevailing professional norms. *Id.* at 688, 104 S. Ct. at 2064. Trial "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690, 104 S. Ct. at 2066. "To overcome that presumption, a defendant must show that counsel failed to act reasonably considering all the circumstances." *Cullen v. Pinholster*, ___ U.S. ___, ____, 131 S. Ct. 1388, 1403 (2011) (quotation marks and alterations omitted). Since it is DeBruce's burden to overcome this presumption, "the absence of evidence cannot overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Titlow*, 134 S. Ct. at 17 (quotation marks and alterations omitted). Given the deference owed counsel under *Strickland* in combination with AEDPA, our review of counsel's performance is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S 111, 123, 129 S. Ct. 1411, 1420 (2009); *see also Pinholster*, 131 S. Ct. at 1403.

To establish that his counsel's deficiency prejudiced his defense, DeBruce "must show that there is a reasonable probability that, but for [his] counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. A reasonable probability is one that sufficiently undermines confidence in the outcome. *Id.* But "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S. Ct. at 792. That said, to show prejudice at either phase of a capital trial, "a defendant

6

need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland,* 466 U.S. at 693, 104 S. Ct. at 2068.  The Supreme Court has explained this is so because an ineffective assistance of counsel "claim asserts the absence of one of the crucial assurances that the result of the proceeding is reliable, so finality concerns are somewhat weaker and the appropriate standard of prejudice should be somewhat lower."  *Id.* at 694, 104 S. Ct. at 2068. "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."  *Id.*  In making the determination about whether there is a reasonable probability that DeBruce would have received a different sentence, a reviewing court must "consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation." *Porter v. McCollum,* 558 U.S. 30, 41, 130 S. Ct. 447, 453–54 (2009) (quotation marks and alteration omitted).

## II.

First, we address DeBruce's arguments pertaining to the guilt phase of his trial, then those pertaining to the sentencing phase.

### A.    Guilt-Phase Ineffective Assistance of Counsel

Testimony at trial established that five armed men were involved in the robbery.  During DeBruce's trial, McCants was the only witness who testified that DeBruce fired the gunshot that killed Douglas Battle, a customer in the store.[4] According to McCants's trial testimony, Battle entered the store while the robbery was in progress.  McCants saw Battle and ordered him to get down on the floor.  Battle threw his wallet at McCants, but did not get onto the ground.  DeBruce approached Battle from behind and hit him with his pistol, causing Battle to fall to the ground.  DeBruce and Battle then engaged in a verbal altercation.  After all of the robbers other than DeBruce left the store, McCants heard a gunshot from inside, and then saw DeBruce run out.  McCants testified that while DeBruce and McCants were riding in the same car escaping from the crime scene, DeBruce admitted to McCants that he shot Battle.  McCants also testified that all of the robbers had agreed prior to the robbery that if they encountered resistance from anyone in the store, the lead robber, Charles Burton, "would take care of it."

---

[4] The remaining testimony at trial established DeBruce's involvement in the robbery and identified the murder weapon.  The State presented testimony from more than twenty witnesses, including five customers and employees of the AutoZone who witnessed the robbery, two of whom testified that DeBruce and one other robber were seen carrying handguns that matched the color of the murder weapon.  However, none of these eyewitnesses were able to identify which of the five robbers shot Battle. Other witnesses included: bystanders on the street who identified DeBruce's vehicle as the getaway car; police who arrested DeBruce one week after the robbery and recovered duct tape and other items from the trunk of DeBruce's vehicle that were used in the robbery; a ballistic weapons expert who identified as the murder weapon a silver handgun found near the house where DeBruce and McCants were staying; and a forensics expert who testified that DeBruce's and several other robbers' fingerprints were discovered at the AutoZone, however, no fingerprints were recovered from the murder weapon.

Finally, McCants identified the handguns belonging to several of the robbers, and testified that the handgun DeBruce carried on the day of Battle's murder was silver, while claiming that his own handgun was black.

DeBruce argues that these aspects of McCants's trial testimony were contradicted by statements McCants made to police officers one week after the incident. During that interrogation, McCants initially denied that he knew who fired the fatal shot; denied that the robbers had agreed to use force against anyone who resisted the robbery; and stated that he and DeBruce left the scene of the murder in separate cars, and that he did not speak to DeBruce after the murder. Further, McCants claimed during the interrogation that he had carried a silver handgun, the same color as the murder weapon, and that he could not remember the guns carried by any of the robbers other than by himself and DeBruce.

DeBruce argues that Mathis performed deficiently in failing to cross-examine McCants with the discrepancies between his interrogation statements and his trial testimony. The Alabama Court of Criminal Appeals concluded that Mathis's cross-examination was not deficient because he impeached McCants with his plea agreement and advanced, via the testimony of DeBruce's niece, the defense's theory that McCants was the shooter. *DeBruce*, 890 So. 2d at 1087.

We cannot say that the state court's conclusion regarding Mathis's performance was an unreasonable application of or contrary to *Strickland*. *See* 28

9

U.S.C. § 2254(d).  In addition to the above-referenced statements, McCants did identify DeBruce as the shooter during his interrogation, albeit only after the police claimed that DeBruce and one of the other robbers had named McCants as the gunman.  Further, the central aspects of McCants's interrogation statements were supportive of his trial testimony.  In particular, McCants stated during both his interrogation and his trial testimony that he saw DeBruce attack Battle from behind, that DeBruce and Battle were in a verbal altercation, and that DeBruce was the only robber remaining in the store when the gunshot was fired.[5]

DeBruce's counsel, Mathis, reviewed the interrogation video but did not use McCants's interrogation statements to impeach him.[6]  Rather, the record reflects

---

[5] Specifically, McCants stated to the police,

[McCants]: Yeah, I couldn't see nothing, but the only person who could have shot him was Derrik. [sic]

Policeman #1: Derrik–and the reason you say that is because, according to you, Derrik was the only one that was in the back of the store?

[McCants]: Yeah.

McCants stated on several other occasions during his interrogation that he witnessed DeBruce attack Battle from behind, and that he believed that DeBruce was the only robber who could have shot Battle.

[6] During the state collateral proceeding conducted in 1999, Mathis firmly denied that he had viewed the video before DeBruce's trial.  However, the trial court in DeBruce's state post-conviction proceeding found that Mathis had viewed the video, a finding that was based on contemporaneous notes made by the prosecutor memorializing that the video was displayed to Mathis.  This finding was also supported by the trial transcript, which reflects that Mathis expressed familiarity with the contents of the video immediately before McCants took the witness stand.

10

that Mathis viewed the interrogation as primarily corroborative of McCants's trial testimony at the time of trial. When the prosecutor notified Mathis shortly before McCants testified that the State would use the interrogation statements to rehabilitate McCants's credibility if impeached, Mathis insisted that he would not attempt to argue that McCants had fabricated his account of the robbery in order to avoid allowing the prosecution to introduce McCants's interrogation statements.

Instead, Mathis introduced the testimony of DeBruce's niece stating that McCants told her one week after the robbery that he, McCants, had committed the shooting, and cross-examined McCants about this statement and his plea agreement. Mathis used this testimony to argue that McCants was the shooter and that he had falsely accused DeBruce in exchange for a lesser sentence. The interrogation statements, which were consistent with McCants's identification of DeBruce as the shooter, would have conflicted with Mathis's attempt to portray McCants as the actual shooter through the testimony of DeBruce's niece. Based on this record, we must reject DeBruce's argument that the Alabama Court of Criminal Appeals' conclusion that Mathis was deficient in failing to cross-examine McCants with the transcript of his interrogation was an unreasonable application of

11

*Strickland*.[7]  *See Strickland*, 466 U.S. at 690–91, 104 S. Ct. at 2066 (discussing

deference owed to counsel's strategic decisions based on adequate investigation).

### B.    Penalty-Phase Ineffective Assistance

Also, DeBruce argues that Mathis was ineffective in failing to investigate

several issues that, he contends, would have led Mathis to discover mitigating

evidence that was never presented at his sentencing, including that DeBruce

experienced violence in his neighborhood and severe abuse at the hands of his

sister, that he dropped out of school in the seventh grade, suffers from mental

impairments and low intellectual functioning, and has a painful intestinal disorder.

To prepare for the sentencing phase of DeBruce's trial, Mathis spoke to two

people: DeBruce and his mother, Jessie DeBruce.  At sentencing, Mathis presented

one witness, Jessie DeBruce, who testified that DeBruce completed high school,

attended college at the University of Alabama, and that although he had an

impoverished childhood, it was otherwise unremarkable.  She also made passing

mention of DeBruce's treatment for a mental disorder, although this statement was

---

[7] We must also reject DeBruce's separate argument that Mathis's assistance was ineffective because he did not introduce evidence that McCants may have been involved in purchasing the murder weapon initially through the use of an alias.  Even if we assume that counsel was deficient in declining to use this evidence, we cannot say that it would have created a reasonable probability of a different outcome during the guilt phase of DeBruce's trial. *See Strickland,* 466 U.S. at 694, 104 S. Ct. at 2068.  This additional evidence does not significantly add to the evidence introduced by Mathis tending to show that McCants may have had access to the murder weapon and, in any event, is not particularly probative in regard to showing that McCants used the weapon during the AutoZone robbery.

not accompanied by any explanation of the disorder or its effects.  DeBruce was also permitted to make a plea to the jury to spare his life.

DeBruce argues that had Mathis conducted a reasonably adequate mitigation investigation the jury should have heard the evidence presented at his state collateral hearing, which consisted of the testimony of three expert medical witnesses and two of DeBruce's sisters.  Among the medical experts, two psychologists presented testimony that DeBruce suffers from lingering emotional damage and social impairments associated with having been raised in a violent community, and that he dropped out of school at the age of sixteen having advanced only to the seventh grade.  Further, the psychologists testified that DeBruce suffers from brain damage and that his intelligence is in the borderline range, with IQ scores between 76 and 79, which was not disputed by the psychologist who testified for the state at the state collateral hearing.[8]  They also testified that DeBruce suffers from blackout episodes consistent with seizures accompanied by periods of non-responsive staring and loss of memory.  One of the psychologists noted that DeBruce was raised in an impoverished family of eleven children with an alcoholic father who was verbally abusive and uninvolved in his

_____

[8] Although the State's psychologist testified that DeBruce suffers from no serious mental illness or mental defect and exhibited some signs of malingering, the State's expert also conceded that DeBruce was giving reasonable effort during testing and that the IQ testing by DeBruce's experts was accurate and would qualify to be considered as a mitigating circumstance.

childrens' upbringing. DeBruce was frequently attacked by gangs in his housing project, often on the way to and from school. DeBruce developed substance abuse problems during his teenage years and was pressured to join gangs. Finally, a gastroenterologist testified that DeBruce was diagnosed with an intestinal disease that causes severe abdominal pain and frequent vomiting, although the diagnosis was not made until after DeBruce's trial and conviction.

Also during the state collateral hearing, DeBruce's sisters testified that DeBruce witnessed stabbings, shootings, and other violence in the housing project where he grew up, and that DeBruce was frequently attacked by gangs. His sister Jacqueline testified that DeBruce was very close to his older brother, who was incarcerated when DeBruce was eight years old, and that DeBruce had little relationship with his father. Jacqueline also testified that DeBruce's older sister, Juanita, was primarily responsible for raising DeBruce and the other children, and that Juanita disciplined DeBruce by beating him and withholding meals. Juanita beat DeBruce with switches and extension cords, and even threatened DeBruce and the other children with a knife. These beatings were often followed by leaving DeBruce in a closet for several hours. Jacqueline explained that sometimes the beatings would occur because DeBruce did not obey an instruction, and at other times Juanita would beat DeBruce because he did not understand his homework. Jacqueline testified that these beatings occurred virtually every day. DeBruce did

14

not resist the beatings but complied with whatever Juanita told him to do, including remaining in the closet until she told him he could leave.  As a child, DeBruce frequently cried himself to sleep, and drew pictures of Juanita holding a knife in her hand.  Jacqueline also testified that DeBruce suffered from chronic health problems, including severe stomach pain and frequent seizures that paralyzed him for five to ten minutes at a time and that required him to be hospitalized on several occasions.  DeBruce's sister Linda also testified that DeBruce took care of her after she had a stroke at the age of twenty-six that rendered her unable to walk, bathe, put on clothes, or feed herself.  Both Jaqueline and Linda testified that they were not contacted by Mathis before DeBruce's trial.

In assessing the reasonableness of Mathis's decision to limit his mitigation investigation to speaking with DeBruce and his mother and not to further investigate DeBruce's mental health and background, we analyze whether Mathis "conducted an adequate background investigation or reasonably decided to end the background investigation when [he] did."  *Cooper v. Sec'y*, 646 F.3d 1328, 1351 (11th Cir. 2011) (internal quotation marks omitted); *see Wiggins v. Smith*, 539 U.S. 510, 533, 123 S. Ct. 2527, 2541 (2003) ("A decision not to investigate . . . must be directly assessed for reasonableness in all the circumstances." (internal quotation marks omitted)); *see also Strickland*, 466 U.S. at 690–91, 104 S. Ct. at 2066 ("[S]trategic choices made after less than complete investigation are reasonable

15

precisely to the extent that reasonable professional judgments support limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.")  DeBruce argues that a pre-trial report created by a social worker at Mathis's request, which assessed DeBruce's competence to stand trial, should have alerted Mathis of the need to make further inquiry into DeBruce's mental health and background.[9]  The report conveyed that DeBruce, who was then twenty years old, had attempted suicide on four occasions.  He had refused special education, and had dropped out of school at the age of sixteen, having advanced only to the seventh grade.  The report stated that DeBruce's intelligence was in the "low average" range, but he denied receiving professional treatment or having been hospitalized for psychiatric reasons.  The report also noted that DeBruce "has a history of problems since childhood including marijuana and alcohol abuse."

---

[9] The State contends that the report was not included in the record submitted to the state trial court that ruled on DeBruce's petition for collateral relief, and that we are therefore foreclosed from considering it.  However, the Alabama Court of Criminal Appeals made clear that its review was based on "the entire record of the trial proceedings in this case, which was filed in the direct appeal" from DeBruce's conviction, noting that the Court "may take judicial notice of [its] own records."  *DeBruce*, 890 So. 2d at 1083 n.6.  Because the report was included in the trial record reviewed by the Alabama Court of Criminal Appeals in DeBruce's collateral appeal, it was part of "the record that was before the state court that adjudicated [DeBruce's] claim on the merits," and we may consider it pursuant to our review under § 2254(d)(1).  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

16

Mathis testified during the state collateral hearing that he took on DeBruce's case within three to four weeks of trial.[10] During the limited time that Mathis had to prepare for DeBruce's trial, he maintained his involvement in other cases that were being tried in the same period, and did not hire an investigator because he did not have the funds to pay for one. Mathis expressly denied that he had any strategic reason not to conduct a background investigation or to follow up on information in the competency report, but that he did not do so because "we just didn't have time." After DeBruce's family retained Mathis, Mathis associated with William DelGrosso to assist in the defense. Mathis testified that DelGrosso began his involvement in the case even later than Mathis and that DelGrosso's assistance in investigating for either the guilt or penalty phases consisted of helping Mathis sort through a banker's box of discovery material. The Alabama Court of Criminal Appeals noted that "DelGrosso did not testify or execute an affidavit for purposes of the postconviction proceedings. We do not know the extent of his involvement in the case or what investigation he conducted in preparation for trial. Neither was Mathis questioned about what investigations that he and DelGrosso conducted." *DeBruce*, 890 S.2d at 1085.

---

[10] Mathis entered his notice of appearance in DeBruce's capital case as a retained lawyer on January 16, 1992. A few days earlier, on January 13, 1992, Mathis had advised the state trial court that he had been retained to represent DeBruce. DeBruce's trial started with jury selection on February 10, 1992, and testimony began the next day. The jury found DeBruce guilty of capital murder on February 13, 1992 and, following a sentencing heading on February 14, 1992, the jury recommended a sentence of death.

17

While it is true that DelGrosso did not testify at the state postconviction hearing, the state court record is not silent about DelGrosso's involvement in this case or about the investigation conducted by Mathis and DelGrosso. During the state postconviction hearing, Mathis was specifically questioned about whether he used the services of a social worker, investigator or other specialist to help him investigate potential mitigation. Mathis explained that he typically used an investigator or subpoenas to help him collect background records, such as school and medical records. And Mathis usually relied on that same investigator to interview siblings, pastors, teachers, and other mitigation witnesses. But in DeBruce's case, Mathis did not work with an investigator to help him do this critical investigation work because there was insufficient time. Nor did Mathis himself have time to do the work the investigator would have done. As a result, he testified "[w]e didn't do it." And there can be no doubt that Mathis was not only speaking for himself, but also testifying about the work DelGrosso did on the case when he Mathis said "[w]e didn't do it." This is so because the record is clear that the only person Mathis had helping him was DelGrosso. Significantly, Mathis repeatedly denied having any strategic reason for not doing the mitigation work that an investigator would have performed. Rather, Mathis offered a simple explanation: "We got in it too late." This postconviction evidence, combined with the minimal mitigation evidence actually presented during the original sentencing

18

proceeding, suggests trial counsel's failure to investigate and present available and compelling mitigating evidence was the result of inattention, not reasonable professional judgment.

Moreover, our review of the entire state court record leads us to conclude that Mathis was lead counsel and DelGrosso played only a minor role in the investigation, preparation and presentation of DeBruce's case. This conclusion is supported by the following facts in the state court record: (1) Mathis was retained by DeBruce's mother; (2) Mathis testified that DelGrosso entered the case much later and only after Mathis "realized how big a task [he] had and asked [DelGrosso]" for help; (3) DelGrosso entered his notice of appearance on January 28, 1992, less than two weeks before the trial started; (4) Mathis's name alone appears on all of DeBruce's pretrial motions; (5) Mathis, not DelGrosso, cross examined all of the state's guilt phase witnesses except for one; (6) Mathis presented DeBruce's case-in-chief during the guilt phase; (7) Mathis presented the testimony of the only penalty phase witness; (8) Mathis alone appeared on DeBruce's behalf at the sentencing hearing before the trial judge; and (9) Mathis alone appeared on DeBruce's behalf at the motion for new trial hearing.

Despite all of this, the Alabama Court of Criminal Appeals concluded that Mathis did not fail to conduct a reasonable investigation because Mathis testified during the state collateral hearing that the information he received did not lead him

19

to question DeBruce's competence to stand trial or to consider defending DeBruce based on a lack of mental capacity.[11]  However, DeBruce's fitness to be tried and decisions about whether to present a mental health defense during the *guilt phase* are separate issues from the decision whether to investigate and present mitigating evidence during *sentencing*.  *See Williams v. Taylor*, 529 U.S. 362, 398, 120 S. Ct. 1495, 1516 (2000) (noting that evidence of defendant's mental capacity and abusive background "may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case"); *Hardwick v. Crosby*, 320 F.3d 1127, 1163 (11th Cir. 2003) ("Regarding mental health mitigating evidence, our court has distinguished between its use during the guilt phase to establish competency to stand trial and presenting mental health mitigating evidence at the penalty phase."); *Blanco v. Singleterry*, 943 F.2d 1477, 1503 (11th Cir. 1991) ("[T]here is a great difference between failing to present evidence sufficient to establish incompetency at trial and failing to pursue mental health mitigating evidence at all.  One can be competent to stand trial and yet suffer from mental health problems that the sentencing jury and judge should have had an opportunity to consider.").  The Alabama Court of Criminal Appeals' determination that Mathis acted strategically in failing to conduct a mitigation

---

[11] *See DeBruce*, 890 So. 2d at 1092 ("[A] preliminary examination had been conducted before trial, and as a result Mathis felt there was no reason to proceed with a mental-health defense.  Mathis testified that he had no reason to doubt DeBruce's mental competency after reviewing the preliminary report.").

investigation is based on its erroneous conflation of the issues of guilt-phase mental health defenses and competence to stand trial with the separate issue of whether to conduct a mitigation investigation. We have held that questions regarding whether an attorney's decision is "strategic" or "tactical" is a question of fact, and whether that decision is reasonable is a question of law. *See Hardwick*, 320 F.3d at 1163. Moreover, a strategic decision cannot be reasonable if it is based on a misunderstanding of the law. *Id.* Here, even if we accept the state court's factual determination that Mathis made a strategic decision not to investigate mitigation evidence based on the results of the pre-trial report governing DeBruce's competency to stand trial, that decision could not have been reasonable as it would have been based on a failure to understand the law. *See Williams*, 529 U.S. at 398, 120 S. Ct. at 1515; *Hardwick*, 320 F.3d at 1163; *Blanco*, 943 F.2d at 1503.[12] Because no lawyer could reasonably have made a strategic decision to forego the pursuit of mitigation evidence based on the results of the pre-trial report governing competency to stand trial, the Alabama Court of Criminal Appeals' conclusion to the contrary constitutes an unreasonable application of *Strickland's* performance prong.

---

[12] Mathis also testified at the state collateral hearing that his decision not to investigate DeBruce's mental health was not the product of a strategic decision, but was instead merely a by-product of lack of time as Mathis scrambled to prepare for trial with less than four weeks' preparation time while also preparing for and conducting other trials.

Moreover, Mathis's decision not to follow up on the information in the competency report was all the more unreasonable insofar as the report contradicted what Mathis had learned about DeBruce's background from DeBruce's mother and from DeBruce's youthful offender investigation report. While DeBruce's mother testified at the sentencing phase of DeBruce's trial that her son had completed high school and attended the University of Alabama, the competency report and DeBruce's school records clearly indicated that he had dropped out of school in the seventh grade at the age of sixteen after being held back several times. The youthful offender investigation report filed on January 7, 1992, also reflected that DeBruce had reported to the probation officer that he was in a "gifted" program in high school and that he had attended one semester of college at the University of Alabama. Although the information furnished by the competency report obviously conflicted with this account of DeBruce's background, Mathis never confronted DeBruce or his mother with these inconsistencies in order to discover the truth, nor did he follow up on the competency report's references to DeBruce's four attempts to commit suicide before the age of twenty. As a result, Mathis permitted DeBruce's mother to present grossly inaccurate testimony during her son's sentencing hearing that DeBruce had been a successful student and had attended the University of Alabama. *See Williams v. Allen*, 542 F.3d 1326, 1340, 130 S. Ct. 447, 453 (11th Cir. 2008) (holding counsel's investigation deficient where

"counsel obtained an incomplete and misleading understanding of [the defendant's] life history" by relying upon the defendant's mother's account despite the availability of several other family members).  *See also Porter v. McCollum*, 558 U.S. 30, 40 (2009) (per curiam) (holding that counsel performed deficiently by failing to investigate mitigating mental health information presented in the defendant's competency report, and that this deficiency could not be excused by defendant's "fatalistic and uncooperative" representations that discouraged counsel from investigating in this area);  *Wiggins*, 539 U.S. at 523–24, 123 S. Ct. at 2536 (holding counsel's performance deficient where counsel failed to follow up on references in the defendant's pre-sentence report to the defendant's "misery as a youth" and his own description of his background as "disgusting").

By failing to take even the first step of asking DeBruce and his mother about the information in the report, Mathis "chose to abandon [his] investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." *Wiggins*, 539 U.S. at 527–28, 123 S. Ct. at 2538.  As we have held before, "[a]lthough counsel need not investigate every evidentiary lead, he must gather enough knowledge of the potential mitigation evidence to arrive at an informed judgment in making that decision." *Jackson v. Herring*, 42 F.3d 1350, 1367 (11th Cir. 1995) (internal quotation marks omitted); *see Williams*, 542 F.3d at 1340 (holding counsel deficient for ignoring "red flags [that] would have prompted

23

a reasonable attorney to conduct additional investigation"); *Fortenberry v. Haley*, 297 F.3d 1213, 1230 (11th Cir. 2002) (Per Curiam) ("Absent any viable strategic reason, however, the failure to present available mitigating evidence renders assistance constitutionally ineffective.").

Here, rather than taking the simple step of questioning DeBruce and his mother about the inconsistency between his mother's account of DeBruce's childhood and the information in the social worker's pre-trial report, trial counsel unreasonably ignored this disparity, failing to make an informed choice not to investigate DeBruce's mental health and background.  Furthermore, counsel's testimony during the state collateral proceedings made clear that his failure to conduct adequate investigation was not the result of a strategic decision, but rather a result of the lack of time as he scrambled to prepare for DeBruce's capital trial with less than four weeks' time while also preparing for and conducting other trials.  As a result of this rush and inattention trial counsel obtained a misleadingly "benign conception of [DeBruce's] upbringing and mental capacity," *Rompilla v. Beard*, 545 U.S. 374, 391, 125 S. Ct. 2456, 2459 (2005), which led him to present the sentencing jury with an incomplete and inaccurate "life profile of [the] defendant."  *Williams*, 542 F.3d at 1339 (alteration in original); *see id.* ("[W]e have found deficient performance in cases where an attorney's efforts to speak with

24

available witnesses were insufficient to formulate an accurate life profile of the defendant." (internal quotation marks omitted)).

"[S]trategic choices made after less than complete investigation are reasonable only to the extent that reasonable professional judgments support the limitations on investigation," *Wiggins*, 539 U.S. at 533, 123 S. Ct. at 2530 (internal quotation marks omitted), and here, there is no indication that Mathis' failure to develop the troubling leads in DeBruce's competency report was supported by a professional judgment not to pursue a mitigation investigation. Accordingly, the Alabama Court of Criminal Appeals conclusion that Mathis was not deficient in failing to question DeBruce and his mother about these overt contradictions constituted an unreasonable application of *Strickland* and its progeny.

Having established that counsel performed deficiently in failing to investigate DeBruce's mental health and background, DeBruce next must show that he suffered prejudice. *See Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. The "relevant question for determining" whether the defendant was prejudiced at sentencing by his counsel's deficiency "is whether 'the entire postconviction record, viewed as a whole and cumulative of mitigation evidence presented originally, raised a reasonable probability that the result of the sentencing proceeding would have been different if competent counsel had presented and explained the significance of all the available evidence.'" *Fortenberry*, 297 F.3d at

25

1229 (quoting *Williams*, 529 U.S. at 399, 120 S. Ct. at 1516).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the petitioner's sentencing.  *Williams*, 529 U.S. at 391, 120 S. Ct. at 1512.

We have explained that "the primary purpose of the penalty phase is to insure that the sentence is individualized by focusing on the particularized characteristics of the defendant."  *Brownlee v. Haley*, 306 F.3d 1043, 1074 (11th Cir. 2002) (internal quotation marks omitted).  To ensure that the penalty phase achieves this purpose we have held that a petitioner is prejudiced where the mitigation evidence omitted by counsel's deficient investigation "paints a vastly different picture of [the petitioner's] background than that created by" the actual penalty-phase testimony.  *Williams*, 542 F.3d at 1342.  "By failing to provide such evidence to the jury, though readily available, trial counsel's deficient performance prejudice[s a petitioner's] ability to receive an individualized sentence."  *Brownlee*, 306 F.3d at 1074 (internal quotation marks omitted).

Here, because Mathis's investigation left him unaware of DeBruce's upbringing, the sentencing jury heard nothing of the daily beatings that DeBruce suffered as a child at the hands of his older sister, his resistance to joining gangs despite their assaults and intimidation, the pervasive violence in his neighborhood that caused him to witness the stabbing of a neighbor and his brother being shot, his one or more suicide attempts, DeBruce's efforts to nurse his sister while she

26

recovered from an incapacitating stroke, DeBruce's alcoholic and disengaged father, or his struggles in school and his low-average intelligence. Although "a troubled history that includes 'severe privation,' 'abuse,' 'physical torment,' and an 'alcoholic, absentee [parent]" like DeBruce's "is the kind of troubled history that the [Supreme] Court has 'declared relevant to assessing a defendant's moral culpability,'" *Johnson v. Sec'y, Dept. of Corr.*, 643 F.3d 907, 935 (11th Cir. 2011) (quoting *Wiggins*, 539 U.S. at 535), and this information could have been discovered by following up on DeBruce's competency report, the jury learned nothing of it. Instead, the sentencing jury heard DeBruce's mother's falsely embellished testimony that he completed high school, attended college, and that although he had an impoverished childhood, it was otherwise unremarkable. Though the jurors also heard his mother make passing mention of his treatment for a mental disorder, this was not accompanied by any explanation, whatsoever, of the disorder or its effects. This generalized description omitted the "particularized characteristics" of DeBruce's heavily disadvantaged background and upbringing, *Brownlee,* 306 F.3d at 1074 (internal quotation marks omitted), and did not even begin to explain the significance of DeBruce's mental impairments, all of which "might well have influenced the jury's appraisal of [DeBruce's] moral culpability," *Wiggins*, 539 U.S. at 538, 123 S. Ct. at 2544 (internal quotation marks omitted). Indeed, far from presenting the jury with "an accurate life profile of [DeBruce],"

27

*Williams*, 542 F.3d at 1339 (internal quotation marks omitted), the profile DeBruce's sentencing jury received was not only incomplete, but also filled with the misinformation that DeBruce had been a successful student who had attended college.

Accordingly, "[t]his is not a case in which the new evidence would barely have altered the sentencing profile presented to the sentencing judge[,]" *Porter*, 558 U.S. at 41, 130 S. Ct. at 454 (internal quotation marks omitted); rather, it is one in which adequate investigation would have enabled counsel to correct a positively misleading sentencing profile, and to present "a vastly different picture . . . than that created" by the actual trial testimony. *Williams*, 542 F.3d at 1342.

The Alabama Court of Criminal Appeals determined that counsel's failure to present this mitigating evidence did not prejudice DeBruce because two aggravating factors were proven against him, and because of its view of the mental health evidence as "conflicting," and of the facts of the murder itself. *DeBruce*, 890 So.2d at 1093. However, the Alabama court's decision to discount the significance of DeBruce's mental health mitigating evidence as "conflicting" lacks support from the record. There was no inconsistency in the testimony by DeBruce's experts at the state collateral hearing, and although the state's psychologist testified that DeBruce "suffers from no serious mental illness or mental defect" and exhibited some signs of malingering, the state's expert also

28

conceded that DeBruce "was giving reasonable effort" during testing and that the IQ testing by DeBruce's experts was accurate and would qualify as a mitigating circumstance. Thus, although there was inconsistency in the testimony by the state's expert, this inconsistency favors DeBruce, and does not justify discounting DeBruce's mitigating evidence.

Moreover, in applying *Strickland* in cases where counsel has failed to introduce any of the available mitigating evidence of the defendant's mental impairment and history of abuse that should have been discovered by adequate investigation, the Supreme Court has repeatedly rejected arguments that the defendant is not prejudiced by the complete omission of this type of evidence. For example, in *Williams v. Taylor*, the Supreme Court held that prejudice was established where counsel had introduced the testimony of four witnesses during the sentencing phase, but none of these witnesses described the "abuse and privation" that the defendant suffered during childhood or his serious mental impairments. 529 U.S. at 398; *see id*. at 370 (describing penalty-phase testimony). Similarly, in *Wiggins v. Smith*, where trial counsel presented no background evidence at all and the jury heard only one mitigating factor at sentencing, 539 U.S. at 515–16, 123 S. Ct. at 2532–33, counsel's failure to present any evidence of the defendant's abusive background prejudiced the defendant, *see id.* at 537–38, 123 S. Ct. at 2543–44. And in *Porter v. McCollum*, the Court again found

29

prejudice where counsel completely failed to present testimony about the defendant's abusive background and mental defects, notwithstanding that, as here, one witness did testify on the defendant's behalf and gave positive information about his background. *Porter*, 558 U.S. at 41–44.[13]

As in each of these cases, the penalty-phase testimony provided by the sole witness called at sentencing gave no indication that DeBruce had suffered abuse during his childhood and had been routinely exposed to violence, although this is the type of background evidence that the Supreme Court has repeatedly "declared relevant to assessing a defendant's moral culpability." *Wiggins*, 539 U.S. at 535, 123 S. C. at 2542. Moreover, according to the state court's own characterization of the sentencing proceeding, the testimony adduced at trial consisted almost entirely of DeBruce and his mother "saying that he was sorry and begging the jury to spare his life." *DeBruce*, 890 So. 2d at 1093. Although DeBruce and his mother pled for mercy at his sentencing, it is unlikely that their pleas resonated with the jury in the absence of the omitted mitigating evidence showing why DeBruce's background and mental capacity may have warranted clemency. *See Rompilla*, 545 U.S. at 393, 125 S. Ct. at 2469 (noting that undiscovered "mitigating evidence,

---

[13] We also have recognized that counsel's failure to adequately describe to the jury a defendant's history of severe abuse may prejudice the defendant even where penalty-phase witnesses testified about other aspects of the defendant's background and character. *See Cooper,* 646 F.3d at 1353–56; *Johnson*, 643 F.3d at 935–37; *Williams*, 542 F.3d at 1342–45.

taken as a whole, might well have influenced the jury's appraisal of [a defendant's] culpability" where the original sentencing strategy included a plea for mercy) (internal quotation marks omitted)).  Indeed, because Mathis's investigation failed to uncover any of the mitigating circumstances that existed in his background, counsel was left without an evidentiary basis on which to make an argument for clemency at the end of sentencing.  Thus, when counsel tried to argue that DeBruce's crime had to be understood in light of his background, the government's objection that the argument was improper because no evidence of that background had been introduced at sentencing was sustained.  But had counsel "presented and explained the significance of" the regular abuse DeBruce suffered throughout his childhood, his exposure to violence in his community and his limited mental capacity, there would have been a compelling basis on which to argue for clemency in light of DeBruce's age and life experiences.  *See Williams*, 529 U.S. at 369 (discussing impact of counsel's inadequate investigation on ability to present a closing argument).[14]  Finally, the State does not point to any additional aggravating evidence that would have been introduced had counsel presented

---

[14] Taking into account DeBruce's troubled and violent history in addition to his youth might well have enabled the jury to understand DeBruce's crime as an "irrational and sudden" killing that deserved lesser punishment because it occurred as part of a robbery "'gone horribly awry—as opposed to one involving murder as the intended goal.'" *Harris v. Dugger*, 874 F.2d 756, 764 (11th Cir. 1989); *see also Porter*, 558 U.S. at 43 ("It is unreasonable to discount to irrelevance . . . evidence of [an] abusive childhood . . . when that kind of history may have particular salience for a jury evaluating [the defendant's] behavior.").

31

testimony about DeBruce's background and mental health.[15]  *See Wiggins*, 539 U.S. at 513, 123 S. Ct. at 2531 (holding that prejudice was enhanced where the State lacked additional aggravating evidence "that could have been introduced . . . to offset this powerful mitigating narrative" of childhood abuse and mental impairment).

Accordingly, we find that the Alabama Court of Criminal Appeals unreasonably applied *Strickland* in holding that the omitted evidence in this case had no reasonable probability of reducing DeBruce's sentence.  Because of trial counsel's deficient performance, DeBruce's jury was given almost no reason to spare his life as demonstrated by the paucity of mitigating evidence actually presented during the penalty phase and the fact that the state trial court found only one mitigating circumstance, DeBruce's age.  *See DeBruce*, 890 So. 2d at 1090; *see Porter*, 558 U.S. at 41, 130 S. Ct. at 454 (finding prejudice where "[t]he judge and jury at [the petitioner's] original sentencing heard almost nothing that would humanize [the petitioner] or allow them to accurately gauge his moral culpability").  We also emphasize this is not a case where the state courts found, or the State has argued in its briefing, that the prejudicial effect of presenting the omitted mitigating evidence would have been offset by the harmful effect of the

---

[15] Indeed, the State explicitly relied upon two aggravating factors – that DeBruce had pled guilty on September 13, 1991, to second-degree robbery for a prior theft and had been sentenced to prison for two years, and that he had been convicted of capital murder for the death of Douglas Battle.

32

evidence itself or would have opened the door to evidence that was more harmful than helpful. *See DeYoung v. Schofield*, 609 F.3d 1260, 1291 (11th Cir. 2010) (discounting the possibility of prejudice where the new mitigating evidence "would have opened the door to harmful testimony which may well have eliminated any mitigating weight in the overall equation").[16]  Because the omitted mitigating evidence, when compared to what little was actually introduced at trial, undermines confidence in the outcome of DeBruce's sentencing, DeBruce suffered prejudice at the penalty phase of his capital murder trial. *See Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

---

[16]  In any event, the Supreme Court found prejudice in *Williams v. Taylor* even though AEDPA deference applied to a state court's adjudication of prejudice in a capital sentencing and "not all of the additional evidence [about the defendant's childhood] was favorable." *Williams*, 529 U.S. at 396, 120 S. Ct. at 1514.

33

MARTIN, Circuit Judge, concurring.

After thorough consideration of this difficult case, Judge Wilson and I have come to the view that Derrick Anthony DeBruce is entitled to habeas relief. This is quite a serious thing, as Mr. DeBruce has been sentenced to death by the State of Alabama. The federal statutory scheme put in place by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) was intended to, and does give great deference to the judgment of a State court decision that adjudicated a federal claim on the merits. See 28 U.S.C. § 2254(d). As it should. "AEDPA recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." Burt v. Titlow, ___ U.S. ___, ___, 134 S. Ct. 10, 15 (2013). At the same time, the Supreme Court has admonished federal judges that, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041 (2003).

None of the three judges on this panel takes this case lightly.[1] On the one hand, Mr. DeBruce was convicted of killing an innocent man named Doug Battle,

---

[1] In the same way, we fully recognize that the judges in Alabama, including Justice Wise (a member of the Alabama Court of Criminal Appeals at the time she considered Mr. DeBruce's case) gave a high level of consideration to Mr. DeBruce's case. The dissent says that Judge Wilson and I are "eager[] to assume" that Justice Wise is a "dolt." See Maj. Op. at 65. Quite to the contrary, we respect and appreciate the Justice's devotion to the demanding work of our profession in general, and Mr. DeBruce's case in particular.

34

who did nothing more than happen by the AutoZone Store in Talladega, Alabama on August 16, 1991. On the other hand, Mr. DeBruce is himself set to die as a result his conviction for killing Mr. Battle. None of the cases involving inmates who are sentenced to death are easy, and Mr. DeBruce's case is no exception. It was filed in our court about three and one-half years ago on April 6, 2011. Four judges of our court have considered the case during the time it has been pending here. It came from the Northern District of Alabama, where it was filed on September 7, 2004, and stayed pending for more than six years.

I write separately because I feel I must respond to the dissenting opinion, and specifically Judge Tjoflat's repeated statements that Judge Wilson and I "invent[ed] some facts," "embellish[ed] the record," exhibited a "lackadaisical relationship with the evidence," and "disregard[ed] AEDPA" in deciding this case. See Maj. Op. at 2, 3, 40, 81. Judge Tjoflat is a nationally known and admired judge who has served as a member of the federal judiciary since 1970, and as a judge for the State of Florida before that. He is not only admired nationally, he is also admired by Judge Wilson and me. Our work would be much quicker, easier and happier if Judge Wilson, Judge Tjoflat and I all agreed on how the law applies to this case—and every other case, for that matter. But if we do our jobs properly, it is inevitable that we will have disagreements. And we disagree here. That being the case, it is incumbent upon each of us, as a part of this difficult process, to lay

35

out how we understand the law to apply to the specifics of Mr. DeBruce's case. Each of us has honestly assessed this case to the best of our ability, and the opposing views expressed in our respective opinions were reached through a sincere effort to properly perform the role required of us as judges of this Court.

TJOFLAT, Circuit Judge, concurring, in part, and dissenting, in part.

Derrick DeBruce's lawyers may or may not have been ineffective. I don't know, and my colleagues don't either. We can't know—despite two decades of litigation in state and federal court—because DeBruce failed to develop a record of what his attorneys did (or did not do) in preparation for the penalty phase[1] of his capital murder trial. Without a thorough record, it is impossible for DeBruce to overcome the "strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance," Strickland v. Washington, 466 U.S. 668, 689, 104 S. Ct. 2052, 2065, 80 L. Ed. 2d 674 (1984), and impossible for this court to say—as it must to grant relief under § 2254—that the State court's application of Strickland was "objectively unreasonable." Williams v. Taylor, 529 U.S. 362, 409, 120 S. Ct. 1495, 1521, 146 L. Ed. 2d 389 (2000).

The State court denied relief because "DeBruce failed to meet his burden on the majority of his claims," most of which "were merely statements that were not supported by any specific facts or evidence." DeBruce v. State, 890 So. 2d 1068, 1083 (Ala. Crim. App. 2003), cert. denied Ex parte DeBruce, No. 1030617 (Ala. Apr. 30, 2004). DeBruce claims his defense team performed an inadequate mitigation investigation, but the record on that point is almost laughably thin, taking up at most a few pages of the collateral hearing transcript. One of

---

[1] I agree with the majority's rejection of DeBruce's guilt-phase ineffectiveness claim.

37

DeBruce's lawyers is totally unaccounted for, id. at 1085 ("We do not know the extent of his involvement in the case or what investigation he conducted in preparation for trial."), the other lawyer was not questioned "about what investigations he and [his colleague] conducted," id., and no one at any point asked the lawyers about their overall strategy. The District Court reviewed the same record and reached the same conclusion, reasoning that DeBruce's "cryptic," "stream of consciousness," "incomplete," and "factually and legally bare" petition was "too conclusory to state an ineffectiveness claim." DeBruce v. Campbell, No. 04-2669, ECF Doc. 31, at 22 (N.D. Ala. Aug. 4, 2010).

But now our court, evidently possessed of special insight, reverses and grants habeas relief. My colleagues do so by inventing a theory of the case that is both factually unsupported and facially implausible: that DeBruce's seasoned capital-defense lawyers walked into the penalty phase of trial without knowing anything about the man they were defending. That claim would be dubious standing alone, but here it must overcome the "doubly deferential" standard of review federal courts apply when Strickland and AEDPA operate in tandem. Yarborough v. Gentry, 540 U.S. 1, 6, 124 S. Ct. 1, 4, 157 L. Ed. 2d 1 (2003). To grant relief under this demanding standard, the majority needs unambiguous evidence that DeBruce's attorneys were incompetent. There is no such evidence, so instead the majority embellishes the record, disregards AEDPA, and succumbs

38

to the "all too tempting" impulse "for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission . . . was unreasonable." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065.

The majority's approach marks a tiresome revival of errors for which our sister circuits have been repeatedly and pointedly reversed. First, instead of holding DeBruce to the burden of proving that his attorneys acted unreasonably, the majority "assum[es] that counsel was ineffective where the record [is] silent," contra Burt v. Titlow, __ U.S. __, 134 S. Ct. 10, 13 (2013), drawing every available inference on DeBruce's behalf, and even inventing some "facts" of its own, as part of what it calls "our review of the entire state court record"— effectively de novo review. Second, the majority affords no deference to the State court; the majority merely substitutes its own Strickland analysis, thereby "treat[ing] the unreasonableness question as a test of its confidence in the result it would reach under de novo review." Contra Harrington v. Richter, __ U.S. __, 131 S. Ct. 770, 785, 178 L. Ed. 2d 624 (2011). And third, in actually evaluating the attorneys under Strickland, the majority relies not on any particular Supreme Court case but merely on its "own sense of 'prudence,' and what appears to be [its] belief that the only reasonable mitigation strategy in capital cases is to 'help' the jury 'understand' the defendant," an approach the Supreme Court rejected as "flatly inconsistent with Strickland's recognition that '[t]here are countless ways to

39

provide effective assistance in any given case.'"  Cullen v. Pinholster, __ U.S. __, 131 S. Ct. 1388, 1407, 179 L. Ed. 2d 557 (2011) (citations omitted, quoting Strickland, 466 U.S. at 689, 104 S. Ct. at 2065).

These errors will do damage beyond this particular case.  Because the majority rules on an incomplete record, it is unable to say what the attorneys here did "wrong" with any precision.  Today's decision thus offers no guidance to lawyers in our circuit, who read our opinions to learn what is expected of them, or to our colleagues on the District Court, who must wrangle "the proliferation of ineffectiveness challenges" invited by the majority's lackadaisical relationship with the evidence.  Strickland, 466 U.S. at 690, 104 S. Ct. at 2066.  Even more troubling is the majority's casual second-guessing of a reasoned State court decision, which the majority overturns on little more than a hunch.  Federal habeas relief requires that the State court make "an error . . . beyond any possibility for fairminded disagreement," Harrington, __ U.S. at __, 131 S. Ct. at 787, but here it seems the State court's only "error" is disagreeing with the majority's debatable reading of an ambiguous record.  Because "AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts," I respectfully dissent.  Renico v. Lett, 559 U.S. 766, 779, 130 S. Ct. 1855, 1866, 176 L. Ed. 2d 678 (2010).

Part I reviews the factual background of the case. Part II highlights deficiencies in the record that should, under AEDPA, preclude habeas relief. Parts III and IV discuss the majority's application of Strickland's performance and prejudice elements, respectively.

I.

Because the majority omits much of the context surrounding DeBruce's trial, I will provide the details of DeBruce's crime before describing the actions of his attorneys. Reading the majority opinion, you might think DeBruce simply woke up one morning to find himself on trial for capital murder. That isn't so: the AutoZone robbery—during which DeBruce fatally shot a man named Douglas Battle, in the back, as Battle lay face-down on the floor—was the culmination of a months-long spree of armed robberies committed or attempted by DeBruce and his associates. DeBruce's lawyers were deeply (and reasonably) concerned that their client's criminal history would prejudice DeBruce in the eyes of the jury, and the lawyers labored to deprive the prosecutor of opportunities to put on evidence of DeBruce's other crimes.

This dynamic, present at virtually every stage of trial, is an essential part of any effort "to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time," Strickland, 466 U.S. at 689, 104 S. Ct. at 2065, and yet it goes unmentioned in today's decision.

41

The majority, sitting at a remove of two decades and hundreds of miles, has the luxury of downplaying the less savory aspects of DeBruce's background, but his defense lawyers did not have that option, and this disconnect blinds the majority to things that would have been obvious to anyone in the courtroom.

To take just one example, today's opinion scolds the lawyers for not presenting mitigation evidence about DeBruce's supposed "resistance to joining gangs," Maj. Op. at 26, which sounds reasonable until one recalls that DeBruce was only on trial in the first place because of his association with a prolific armed-robbery gang. A lawyer on the ground would see immediately that the majority's preferred strategy would be an outright gift to the prosecutor—and would be, no doubt, the basis of yet another ineffectiveness challenge, this time concerning what an obviously terrible idea it is to "invite[] the strongest possible evidence in rebuttal" with "[a] heavyhanded case to portray [petitioner] in a positive light." See Wong v. Belmontes, 558 U.S. 15, 25, 130 S. Ct. 383, 389, 175 L. Ed. 2d 328 (2009). This kind of backseat defense lawyering pervades the majority opinion.

The broader point is that Strickland claims are meaningless without context. "[T]rial lawyers, in every case, could have done something more or something different," and "omissions are inevitable." Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc). Whether those omissions are reasonable is a contextual inquiry, turning on the options realistically available to the attorneys,

42

and their reasons for picking some options over others.  Accordingly, the "longstanding case-by-case approach to determining whether an attorney's performance" was deficient requires that we start with a full understanding of the case's background.  Rompilla v. Beard, 545 U.S. 374, 394, 125 S. Ct. 2456, 2469, 162 L. Ed. 2d 360 (2005) (O'Connor, J., concurring).

## A.

In January 1991, DeBruce and an associate robbed a man named Bryan White on the street.  In addition to stealing White's paycheck, the robbers took a necklace with a distinctive gold pendant in the shape of a pistol.  DeBruce evidently liked the necklace, as he continued to wear it while he committed the other crimes that would lead to his arrest for the AutoZone robbery.  In August of that year, the owner of a jewelry store in Sylacauga, Alabama, reported being robbed by, among others, a man wearing a necklace with a gold pistol-shaped pendant.  A few days later, DeBruce and five other men attempted to rob the City National Bank in Sylacauga.  Armed with handguns, they entered the bank only to abandon the plan and walk out when one of the robbers lost his nerve. Surveillance cameras recorded their arrival and departure, and captured images of DeBruce, still wearing the gold pistol-shaped pendant.

Unsatisfied, the men drove to Talladega and brainstormed places to rob. They settled on a nearby AutoZone, and after driving past the store for

43

reconnaissance, the men devised a plan: still armed, they would enter the store and pretend to browse the merchandise. Eventually their ringleader, a man named Charles Burton, would initiate the robbery, at which point the robbers would draw their handguns and force all the customers and employees to the floor. If anything went awry and an employee or customer became uncooperative and "needed killing or anything," Burton said he "would take care of it." State Court—Trial Transcript, Vol. 6, at 911. The men went through with the robbery, and as they made their getaway DeBruce shot and killed one of the customers, Douglas Battle, with whom DeBruce had some kind of verbal altercation.

The police quickly identified DeBruce and his associates as the robbers, in part because the men had already been targets of an investigation (an effort the police, with characteristic portentousness, called the "Trojan Horse Operation"). The police compared their existing surveillance photos with video taken by the security cameras at the City National Bank. One detective noticed that the necklace DeBruce wore in the video matched the necklace stolen from Bryan White, which had in turn been worn by one of the people who robbed the jewelry store in Sylacauga. Witnesses to the AutoZone robbery identified several of the men, including DeBruce, in police photo arrays. And a fingerprint recovered from the AutoZone matched a print already on file for Charles Burton. Convinced they had their men, the police arrested DeBruce and his associates on August 23, 1991.

44

During a police interrogation, one of the robbers, LuJuan McCants, identified

DeBruce as the man who shot Battle.  McCants agreed to cooperate with the State

and testify against DeBruce.

## B.

Charged with capital murder, DeBruce was initially represented by a court-

appointed attorney.  DeBruce's mother, Jessie DeBruce, had little faith in the

court-appointed lawyer and approached a local criminal-defense attorney, Erskine

Mathis.  "I didn't know any of these people," Mathis later testified at the Rule 32

evidentiary hearing.  "[Jessie DeBruce] came in my office on this particular day,

and she was scared to death that her boy was going to end up in the electric chair,

and she was afraid that the young lawyer who had been appointed to represent him

would not do as good a job as somebody that she hired.  I felt sorry for her."  State

Court—Collateral Transcript, Vol. 15, at 59.  Mathis agreed to take over the case.[2]

Mathis was at that time an established capital-defense attorney.  Mathis

testified that "90 to 95" percent of his caseload was criminal.  Id. at 170.  He had

earned CLE credits dealing solely with capital litigation, and had handled

---

[2] Mathis testified that he charged DeBruce's family $10, 000 for the representation, and "they paid about $1, 500."  State Court—Collateral Transcript, Vol. 15, at 61.  Curiously, other members of the DeBruce family continued to use Mathis's legal services even after Derrick DeBruce's conviction.  The State court found it "interesting that Mathis testified at the postconviction evidentiary hearing that since DeBruce's trial he has represented 'several' of DeBruce's 10 siblings."  DeBruce, 890 So. 2d at 1081 n.3 (quoting State Court—Collateral Transcript, Vol. 15, at 173).

"probably 10 or 12" capital cases before representing DeBruce. Id. at 171. Up to

that point, no client of his had been sentenced to death. "DeBruce was the very

first person I lost to the death penalty," Mathis testified later. "Most of the other

cases were either capital murder verdicts with life without parole sentences or

felony murder verdicts. I won one or two during that period of time outright. . . . I

had been, I believe, very successful in capital litigation up to that point." Id.

Jessie DeBruce's fears about her son's court-appointed attorney turned out

to be well-founded: when Mathis took over the case, he saw that almost nothing

had been done save for the filing of a discovery motion. Id. at 59–60. Mathis

"filed a fistful of motions," id. at 65, and associated a second attorney, William

DelGrosso, as co-counsel once he "realized how big a task I had," id. at 185. The

exact nature of DelGrosso's involvement is not clear from the record because

"DelGrosso did not testify or execute an affidavit for purposes of the

postconviction proceedings." DeBruce, 890 So. 2d at 1085. Mathis testified that

DelGrosso was "a tremendous help," that he could not recall "any particular

division of duties" between them, that he was "sure" DelGrosso looked through the

discovery material before trial, that the two attorneys had worked together before,

and that DelGrosso had "probably tried as many capital murder cases as I have."

State Court—Collateral Transcript, Vol. 15, at 179–80.

46

The record is largely silent about what activities Mathis and DelGrosso undertook in the time leading up to trial. We can infer from the record that the lawyers had regular meetings with their client and their client's mother: in a pre-trial meeting with the court, Mathis made passing reference to "some information I was given by this defendant's mother prior to having the opportunity to speak at length with him," State Court—Trial Transcript, Vol. 1, at 12, though it is not clear what "some information" refers to. Subsequently, Mathis said, "I have spoke [sic] with him [i.e., DeBruce] many times." Id.

It appears that whatever "information" Mathis received related to potential mitigation evidence, because Mathis made those comments as part of a request that the court arrange a pre-trial mental evaluation of his client, which Mathis said "would be for the <u>purposes of the punishment phase</u> of the trial . . . if it comes down to it." Id. at 12–13 (emphasis added). We do not know—because Mathis was never asked at the Rule 32 hearing—about the substance of his conversations with his client or his client's mother, or about his subsequent use of the pre-trial mental evaluation, or about his overall strategy for the penalty phase. All we know is that the court, in response to Mathis's request, assigned a psychologist, Gary Garner, to conduct a pre-trial mental evaluation of DeBruce, and that his report

47

(hereinafter the "Garner Report") now plays an outsize role in DeBruce's

postconviction litigation.[3]

The Garner Report is a short document labeled "Mental Status Exam." It

conveys, as relevant to this appeal, that:

- "He [i.e., DeBruce] reports having to be hospitalized on two occasions during his jail stay for what he describes as 'throwing up.'"
- "He reports a history of problems since childhood including alcohol and marijuana abuse."
- "He has attempted suicide four times."
- "He denies any prior mental health treatment or psychiatric hospitalization."
- "Mr. DeBruce admitted to on going [sic] problems in school."
- "He refused special education and dropped out of school in the seventh grade at age 16."
- "He admits that his father is probably an alcoholic."
- "Mr. DeBruce was oriented and aware in all spheres. His memory appeared fair for past and recent experiences and good for immediate impressions. General grasp and recall appeared fair. Mr. DeBruce's intellectual ability appeared to be in the low average range."

Garner Report at 1. At the Rule 32 hearing, no one asked Mathis about the Garner

Report.

As for the rest of the attorneys' preparatory activities, we know very little.

Mathis was asked—at the Rule 32 hearing—a few brief, narrow questions about

his investigation of DeBruce's background, and he gave brief, narrow answers on

which DeBruce (by then represented by new lawyers) never followed up. Mathis

---

[3] Gary Garner did not testify at trial or at the Rule 32 hearing. At the end of his report, he identified himself as "Gary L. Garner, M.S.," and listed his title as "Co-ordinator Talladega Mental Health Center."

testified that he had received a banker's box full of discovery materials and that he had reviewed the contents.  Mathis also testified that he had no recollection of seeing a videotape of LuJuan McCants's police interrogation, but the Rule 32 judge did not find Mathis credible on this point: "The Court finds that Erskine Mathis, contrary to his recollection, viewed the videotape in advance of trial."  See DeBruce, 890 So. 2d at 1087 (quoting the circuit court ruling).  Finally, Mathis testified about three specific investigative avenues he did not pursue: he did not hire an outside investigator, he did not gather medical records, and he did not gather academic records.

### C.

The guilt phase of DeBruce's trial began on February 11, 1992.  The defense team's objective was to avoid the capital murder conviction: they recognized that the State's case for death was built entirely around LuJuan McCants's identification of DeBruce as the shooter inside the AutoZone.  If they could cast doubt on the credibility of that identification—by suggesting that it was in fact McCants who had shot Battle, taken a plea, and then fingered DeBruce to save himself—then DeBruce might be convicted of felony murder, rather than capital murder, and thereby evade a death sentence.  But the defense lawyers also understood that impeaching McCants risked opening the door to testimony about

49

all of DeBruce's criminal activity preceding the AutoZone robbery, which the attorneys recognized to be prejudicial.

Mathis tried to thread the needle. Anticipating that the prosecutor would ask McCants about the earlier robberies, Mathis moved the court to instruct the prosecutor, on direct examination, not to elicit from McCants anything about "any other crimes for which my client was not on trial here today" because "to get involved in these various robberies that they could very well talk about . . . would be highly prejudicial to my client in this particular situation and would far outweigh any probative value it may have regarding this crime for which he is on trial." State Court—Trial Transcript, Vol. 6, at 892.

Mathis also sought to prevent the prosecutor, on redirect examination, "from going into these various [other] crimes . . . if and when I attempt to impeach [McCants] based on a[ ] [plea] agreement, which [McCants] ha[s] reached with the State of Alabama." Id. at 895. Mathis was concerned that the State's cooperation agreement with McCants encompassed both the AutoZone and City National Bank crimes and even suggested that the "agreement was designed . . . so that it would give the prosecuting attorney . . . an opportunity to stand in and argue that if I ask about that agreement, I'm opening the door for him to get into the [attempted] robbery in Sylacauga." Id. at 895–96.

The prosecutor denied that the agreement was so designed and said it was "fine with me to leave out the . . . the attempted robbery [of the City National Bank] in the agreement." Id. at 896. The prosecutor went on to warn, however, that there was a limit. When the police first questioned McCants, he had initially denied knowing anything about the AutoZone or City National Bank crimes. He had only identified DeBruce as the AutoZone shooter after the police said they might charge McCants with the shooting. At trial, the prosecutor warned that if Mathis tried in cross-examination to bring out that McCants had initially denied knowing about the robbery, then the prosecutor would consider the door opened to evidence of other crimes: "if on cross examination on McCants you start talking about his statement of last week, or the week before . . . I'm entitled to show that he gave a statement back on August 24th," id. at 897–98, referring to a videotape of the police interrogation of McCants.

Mathis replied that he had no intention of bringing up McCants's earlier denials:

> **MR. MATHIS**: Oh, okay.  I know what you are talking about.  You just don't want me trying to allege that [McCants] just come up with this story last week.
> **[PROSECUTOR]**:  That's right.
> **MR. MATHIS**:  Okay, don't worry about that.
> **[PROSECUTOR]**:  If you do that, then I'm going to try to get into the August statement.
> **MR. MATHIS**:  I'm not doing it.

51

Id. at 898.   At the end of this exchange about the scope of McCants's testimony, the court instructed McCants "not to give any testimony relative to any other crimes that might have occurred except for the AutoZone charge here" or testify about his plea agreement with the State "except the agreement relative to the AutoZone case here in Talladega." Id. at 899–900.

Having secured this instruction, Mathis attempted to impeach McCants's testimony without opening the door to testimony about the other crimes.  He asked McCants about the existence of the plea agreement, and then asked, point blank, if McCants had shot Douglas Battle.  McCants said he had not.  Mathis asked if McCants had bragged to DeBruce's niece, Kiawatta, about shooting Battle.  McCants again said he had not.  Mathis subsequently called Kiawatta DeBruce, who testified that McCants had confessed to shooting Battle in a conversation after the robbery.

Mathis focused on this alternate-shooter theory in his closing argument, suggesting that McCants had taken a plea and testified against DeBruce in order to save himself, and referenced Kiawatta DeBruce's testimony to further undermine McCants's credibility.  Later, at the Rule 32 hearing, the prosecutor testified that he thought Mathis had done such a good job undermining McCants that he had been afraid Mathis's strategy might work.  But it didn't work: on Febuary 13, 1992, the jury convicted DeBruce of capital murder.

52

D.

The penalty phase of the trial began and ended the next day.  The State, in seeking the death penalty, relied on evidence from the guilt phase of trial and on two aggravating factors: that DeBruce had pled guilty on September 13, 1991, to second-degree robbery for the White theft, and that DeBruce had been convicted of capital murder for the killing of Douglas Battle.

The State appeals court found that the defense lawyers' "strategy in the penalty phase was to beg for mercy." DeBruce, 890 So. 2d at 1093.  The defense called DeBruce's mother, Jessie DeBruce.  She testified that Derrick was the youngest of her eleven children; all six of his brothers were either in or had been in prison.  When DeBruce was a child, Jessie DeBruce said she worked cleaning houses while DeBruce's father worked construction, making "a very small amount" of money.  At one point she described the family's rented house as "[u]nfit to live in."  She said that DeBruce graduated from high school and attended the University of Alabama–Birmingham.  She said that DeBruce had a son. Jessie DeBruce expressed love for her son, said that there was "good" in him, and begged the jury to spare his life.

Jessie DeBruce had already been excused when she volunteered that she had "something else" to say.  Mathis began redirect examination, and she said that DeBruce's mind "is not good." State Court—Trial Transcript, Vol. 7, at 1138.

53

She claimed DeBruce had previously been treated for a mental disorder "[b]ecause we had a lot of problems with him when he was in school." Id. at 1139. She went on to describe various incidents during which DeBruce "would get nervous and get to shaking," along with an incident during which the family called the police "to talk to him." Id. She said, finally, that her son was "easily led." Id.

This testimony appears to have caught the attorneys off-guard. The court went into recess and the prosecutor demanded that he be allowed to call Gary Garner, the psychologist who had evaluated DeBruce before trial. The State believed that Garner's report contradicted what Jessie DeBruce had said: for example, according to the report, DeBruce had never been treated for a mental disorder. The prosecutor also objected to the statement that DeBruce was "easily led," and asked to call one of the cooperating witnesses to testify that after the murder DeBruce had tried to arrange for LuJuan McCants to "take the murder rap since [McCants] is a juvenile"—apparently on the theory that this would show DeBruce to be an active, knowledgeable participant in the group's criminal activities. See id. at 1146–48. DelGrosso opposed both proposals, arguing that the Garner Report was only hearsay and could not be used to impeach Jessie DeBruce's testimony. The court agreed with the prosecutor, and indicated that Garner should testify. In one of this record's many unexplained gaps, however,

54

this issue was never resolved: Garner did not testify, and no one mentioned the matter again at trial.

The court allowed DeBruce to make a direct statement to the jury. DeBruce asked the jury to spare his life and allow him to see his son grow up. Id. at 1169–70. Thereafter, DelGrosso presented DeBruce's closing argument to the jury. DelGrosso appealed to the jury as parents, asking them to view DeBruce as a "kid" who did not deserve to die just because he had done something "stupid." Id. at 1172.

The jury recommended the death penalty by a vote of 11 to 1, and the court scheduled the sentencing for March 13, 1992, ordering the preparation of a presentence report in the interim. At sentencing, Mathis argued that the court should sentence DeBruce to a term of life without parole so that he could continue to see his family. The court then addressed DeBruce, and inquired about his health. DeBruce said it was "fair." Mathis said that DeBruce was suffering from "extreme stomach problems," which his incarceration was aggravating. Id. at 1214. The court sentenced DeBruce to death. The court found the two aggravating circumstances the State relied upon, and one statutory mitigator: DeBruce's age of twenty.

## II.

DeBruce makes the startling assertion that his attorneys failed "to conduct any investigation into available mitigating evidence," Pet'r's Br. at 63 (emphasis in original), but his claim is demonstrably false. Mere paragraphs later, in the same brief, DeBruce concedes that, actually, his lawyers interviewed him and interviewed his mother (though DeBruce won't say what they talked about) and also admits his lawyers arranged for a mental examination and report by a court-appointed psychologist. When the attorneys requested that examination, they told the trial judge it "would be for the purposes of the punishment phase of the trial." State Court—Trial Transcript, Vol. 1, at 12–13. Thus, even on the scant record before us, it's clear the lawyers were aware of and acting on "the need for defense counsel to conduct some sort of mitigation investigation," though the scope of that investigation is unclear. Porter v. McCollum, 558 U.S. 30, 40, 130 S. Ct. 447, 453, 175 L. Ed. 2d 398 (2009) (per curiam) (emphasis in original).

The majority ultimately endorses a watered-down version of DeBruce's claim: that the attorneys should have done more to investigate mitigating evidence. But, incredibly, DeBruce can't prove that his attorneys didn't do more, nor can he prove that further investigation would have told the lawyers anything they didn't already know. The majority thus transgresses a basic principal of habeas: "[t]he petitioner carries the burden of proof." Pinholster, __ U.S. at __, 131 S. Ct. at 1398. This burden has teeth, and DeBruce's failure to produce a thorough record

56

is—by itself—a robust barrier to relief. See Titlow, __ U.S. at __, 134 S. Ct. at 19 (Sotomayor, J., concurring) ("Had [the petitioner] made a better factual record—had she actually shown, for example, that [the defense attorney] failed to educate himself about the case . . . then she could well have prevailed.").

Here, the majority overlooks three enormous gaps in the record. First, we do not know anything about the second-chair attorney, DelGrosso, who may have made investigations not reflected in the record. Second, DeBruce's case against Mathis is selective and at best circumstantial, with no inquiry into what the attorneys knew about their client or about their overall mitigation strategy. And third, the lawyers were never questioned about information in the Garner Report—an omission that does not stop the majority from concluding, with zero evidence, that the attorneys never read it.

## A.

The first and most serious hole in the record is DeBruce's omission of half his defense team. DeBruce's briefing implies that Mathis was his only lawyer, when in fact there was a second attorney, William DelGrosso, whom DeBruce has tried to erase from history. DeBruce did not call DelGrosso to testify at the Rule 32 hearing, did not present evidence about DelGrosso's pretrial activities, did not question Mathis about DelGrosso's involvement, and does not even mention DelGrosso in his brief, except in the prefatory "Certificate of Interested Persons,"

57

where DelGrosso is identified as "co-counsel for Derrick DeBruce at trial." Pet'r's Br. at C-2. This omission is inexcusable, particularly because it was DelGrosso, not Mathis, who delivered the opening statement and closing argument to the jury at the penalty phase of trial—the phase during which DeBruce says his attorneys were ineffective. See State Court—Trial Transcript, Vol. 7, at 1105–10, 1171–73.

DeBruce's failure to account for DelGrosso is fatal to his ineffectiveness claim. "It should go without saying that the absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance,'" and here we have no evidence at all. Titlow, __ U.S. at __, 134 S. Ct. at 17 (citation omitted). For all we know, DelGrosso did everything DeBruce says his attorneys failed to do, and there may be other mitigation investigations we know nothing about. Indeed, Strickland requires that we presume DelGrosso acted reasonably and then look to DeBruce to rebut that presumption. "[W]here the record is incomplete or unclear about [the attorney's] actions, we will presume that he did what he should have done." Williams v. Head, 185 F.3d 1223, 1228 (11th Cir. 1999). DeBruce cannot rebut Strickland's presumption because he says nothing at all about DelGrosso, and the inquiry is therefore at an end. The State court saw this clearly:

> DeBruce was represented by two attorneys at trial; however, only one attorney testified at the postconviction hearing. DelGrosso did not testify or execute an affidavit for purposes of the postconviction proceedings. We do not know the extent of his involvement in the

58

> case or what investigation he conducted in preparation for trial.
> Neither was Mathis questioned about what investigations that he and
> DelGrosso conducted.

DeBruce, 890 So. 2d at 1085 (emphasis added).

The State court's findings are more than reasonable; under AEDPA, they are bulletproof. AEDPA only permits federal habeas relief in two circumstances: if the State court's decision was "based on an unreasonable determination of the facts," or if the State court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by" the Supreme Court. § 2254. DeBruce cannot meet either condition. The State court's fact-finding is obviously correct: there is simply no evidence, one way or the other, about DelGrosso's mitigation activities. And it therefore cannot have been unreasonable, as a legal matter, to say that DeBruce failed to carry his burden of proof concerning DelGrosso. There is thus no lawful avenue for federal habeas relief.

The majority sets the State court ruling aside without even mentioning, much less applying, § 2254. Instead, the majority undertakes what it calls "our review of the entire state court record" and constructs, on its own initiative, an argument on DeBruce's behalf. That is worth repeating. DeBruce does not argue that DelGrosso rendered ineffective assistance; instead, he simply ignores his second attorney, and hopes that we do the same. Instead of acknowledging this

59

critical flaw in DeBruce's petition, the majority—on what is supposed to be our highly deferential posture of AEDPA review—scours the record, sua sponte, and makes the argument for him. That is simply out of bounds. What's more, the argument the majority writes for DeBruce is exceedingly weak, and would not even rebut the Strickland presumption on de novo review. I will consider first the facts, and then the law.

1.

The State court did not make "an unreasonable determination of the facts" concerning DelGrosso. § 2254(d)(2). The court said—accurately—that "[w]e do not know the extent of his involvement in the case or what investigation he conducted in preparation for trial." DeBruce, 890 So. 2d at 1085. The majority chooses to discount this hole in the record for reasons that do not withstand scrutiny.

First, the majority, having undertaken a "review of the entire state court record," says that "Mathis was lead counsel and DelGrosso played only a minor role" in DeBruce's defense. Maj. Op. at 19. As a threshold matter, I do not know where the majority's "review of the entire state court record" standard comes from, but it sounds an awful lot like de novo review. It certainly isn't AEDPA, because § 2254 only asks whether the State court's factual finding was reasonable, not whether we would make the same finding were we to consider the issue afresh.

60

"[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, 558 U.S. 290, 301, 130 S. Ct. 841, __, 175 L. Ed. 2d 738 (2010). In applying its own "review of the entire state court record" instead of § 2254, the majority asks the wrong question.

The majority then delivers the wrong answer, because its conclusion—that "Mathis was lead counsel and DelGrosso played only a minor role"—is an obvious non sequitur. Even assuming DelGrosso played a minor role in the overall defense, it does not follow that he did nothing to prepare specifically for the penalty phase, which is the subject of DeBruce's Strickland claim. I suppose a placekicker plays "only a minor role" in the grand scheme of a football game, but his efforts nonetheless matter a great deal. Similarly, DelGrosso appears to have focused his energies on the penalty phase, as evidenced by the fact that he delivered the opening statement and closing argument—though of course we can't be sure, because DeBruce presents no evidence about DelGrosso. In any event, the question under Strickland is not whether DelGrosso's role was a "minor" or "major" one, but whether he contributed to the attorneys' mitigation investigation, and if so, how. On that question—which is to say, on the relevant question—the record is totally silent.

61

Protesting perhaps a little too much, the majority submits no fewer than nine numbered facts to support the (uncontroversial) proposition that DelGrosso was the second-chair attorney on the defense team.  The majority's list actually serves to underscore how little we know about DelGrosso: eight of the nine items are about Mathis, not DelGrosso, and not one of the facts addresses the actual question, which is what DelGrosso did to prepare for the penalty phase of trial.  The majority's "proof" is thus a parade of irrelevancies: "Mathis's name alone appears on all of DeBruce's pretrial motions"; "Mathis, not DelGrosso, cross examined all of the state's guilt phase witnesses"; "Mathis presented DeBruce's case-in-chief during the guilt phase"; and so on.  Maj. Op. at 19 (emphasis added).  Irrelevant facts, delivered in bulk, are still irrelevant.  Nothing here establishes, or even suggests, that DelGrosso was ineffective.  As the State court rightly concluded, we simply do not know.

The majority's other argument for ignoring DelGrosso rests on a flagrant misreading of the record.  The majority says we needn't worry about DelGrosso because Mathis testified at the Rule 32 hearing "that DelGrosso's assistance in investigating for either the guilt or penalty phases consisted of helping Mathis sort through a banker's box of discovery material."  Maj. Op. at 17 (emphasis added).  The word "consisted" does all the work in that sentence: the reader is meant to understand that Mathis said DelGrosso did nothing beyond looking through the

62

banker's box.  But Mathis never said that; nobody even asked that question.  Here

is the transcript:

> **[THE STATE]**: Mr. Mathis, did you have the assistance of—you did
>     have the assistance of co-counsel in this case?
> **[MATHIS]**:  I got Bill DelGrosso, and he was a tremendous help.
> **[THE STATE]**:  To what extent did you divide your duties in
>     preparing for the case?
> **[MATHIS]**:  You grab a pile and I grab the other.  I don't think there
>     was any particular division of duties.  We were just working
>     together trying to get all of this done.
> **[THE STATE]**:  Did he look through discovery also?
> **[MATHIS]**:  Ma'am, I'm sure he did.  We were right there in the
>     same building.  We had the same office.  We're in the same
>     building, and each of us had equal access.
> **[COUNSEL FOR DEBRUCE]**:  I would object.  I would ask that the
>     witness answer whether he knows for a fact or not whether Mr.
>     DelGrosso actually did look through the discovery material.
> **THE COURT**:  If he doesn't remember exactly, he can give you a
>     judgment.  Did y'all work together on the case?
> **[MATHIS]**:  I'm sure he looked through it, Judge.
> **THE COURT**:  Y'all worked together on other cases?
> **[MATHIS]**:  Yeah.
> **THE COURT**:  What kind of experience did he have?
> **[MATHIS]**:  He's probably tried as many capital murder cases as I
>     have.
> **THE COURT**:  At that time?
> **[MATHIS]**:  Oh yeah.

State Court—Collateral Appeal Transcript, Vol. 15, at 179–80.  There is no basis

in this testimony for the majority's claim that DelGrosso's work "consisted," in its

entirety, of a review of discovery materials.  Mathis was responding to a specific

question: he was "sure" DelGrosso reviewed the box of documents.  But that does

not establish—and Mathis did not say—that this was the <u>only</u> thing DelGrosso did.

Nobody asked about that.

63

In sum, even after its improper "review of the entire state court record," the majority comes up empty on the question of DelGrosso's performance. The State court was manifestly correct in saying that we simply do not know what he did.

2.

The State court's decision was not contrary to, or an unreasonable application of, Supreme Court precedent. § 2254(d)(1). The legal principle here is not complicated or controversial: a habeas petitioner who fails to document his attorney's actions cannot successfully claim that the attorney was ineffective. The Supreme Court just last term rejected an ineffectiveness claim because of the petitioner's "failure to present enough evidence of what [the attorney] did or did not do." Titlow, 134 S. Ct. at 18 (Sotomayor, J., concurring); see also Burger v. Kemp, 483 U.S. 776, 793, 107 S. Ct. 3114, 3125, 97 L. Ed. 2d 638 (1987) (refusing to draw an inference on petitioner's behalf where petitioner "has submitted no affidavit from that lawyer establishing that he would have offered substantial mitigating evidence if he had testified."); Kimmelman v. Morrison, 477 U.S. 365, 384, 106 S. Ct. 2574, 2588, 91 L. Ed. 2d 305 (1986) ("Counsel's competence . . . is presumed, and the defendant must rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." (emphasis added, citations omitted)).

64

This rule is a familiar one to Alabama judges. "It is extremely difficult, if not impossible, to prove a claim of ineffective assistance of counsel without questioning counsel about the specific claim, especially when the claim is based on specific actions, or inactions, of counsel that occurred outside the record." Broadnax v. State, 130 So. 3d 1232, 1255 (Ala. Crim. App. 2013). And I know for a fact that this is the rule our court applies: "An ambiguous or silent record is not sufficient to disprove the strong and continuing [Strickland] presumption." Chandler, 218 F.3d at 1314 n.15.

Sometimes this rule is harsh. In one case, the petitioner's attorney died before the collateral hearing, and the petitioner was thus physically incapable of questioning the attorney about his actions at trial. See Callahan v. Campbell, 427 F.3d 897, 933 (11th Cir. 2005). We nonetheless denied relief: "Because [the lawyer] passed away before the Rule 32 hearing, we have no evidence of what he did to prepare for the penalty phase of [the petitioner's] trial. In a situation like this, we will presume the attorney did what we should have done, and that he exercised reasonable professional judgment." Id. (footnotes and citations omitted). One judge on the Callahan panel expressed serious reservations about the adequacy of counsel's mitigation investigation, noting "[t]here is no evidence [the lawyer] performed any substantial investigation into [the petitioner's] background, or attempted to call family members other than [the petitioner's] aunt," but there was

65

no evidence either way, and "since we are bound by our circuit precedent, we presume [the lawyer] did" what he should have done.  Id. at 938–39 (Wilson, J., concurring) (emphasis added).  The same reasoning applies to DelGrosso in this case.

B.

We know more about Mathis than we do about DelGrosso, but we do not know enough to overcome the Strickland presumption.  DeBruce's entire case against Mathis is drawn from about a page and a half of superficial Rule 32 testimony.  Mathis was asked about three things he did not do, but was never asked about his overall strategy for the penalty phase, or about how much he learned about DeBruce's life from other sources (like DeBruce himself, or DeBruce's mother), or even whether he would have put on a different mitigation case if he could do it all over again.  The majority nonetheless treats this testimony as incontrovertible proof of ineffectiveness, and adopts DeBruce's theory of the case wholesale.

DeBruce's theory is as follows: "When asked to explain his failure to investigate, Mathis cited time and resource constraints—not strategic concerns."  Pet'r's Br. at 67 (emphasis added).  DeBruce then cites the Rule 32 transcript.  A casual reader would take "failure to investigate" to refer to the whole scope of an attorney's investigation; DeBruce means us to infer that behind the citation we will

66

find Mathis both conceding a total "failure to investigate" and attributing it to a lack of time.  Here, then, is the entirety of the testimony that supposedly establishes a total "failure to investigate":

> **Q**:  And do you normally have a social worker or investigator or other specialist help you gather evidence?
>
> **[MATHIS]**:  We normally have an investigator who does that, an investigator plus the other people in my office.
>
> **Q**:  And does that person normally gather the client's school records?
>
> **[MATHIS]**:  Yes. We would normally subpoena—we would find out from the client which schools he attended and immediately issue subpoenas for all the school records, and we would do that and set a date way ahead of trial so that the stuff would be brought to the courthouse so we could get it.
>
> **Q**:  And does that person normally interview siblings and pastors and teachers and other litigation witnesses?
>
> **[MATHIS]**:  Yes.
>
> **Q**:  And did you have such a person working with you on this case?
>
> **[MATHIS]**:  No.  We just didn't have time.  We did not have the time.  We didn't do it.
>
> **Q**:  Did you have time to gather Mr. DeBruce's school records yourself?
>
> **[MATHIS]**:  None.
>
> **Q**:  You didn't have a strategic reason for not doing so?
>
> **[MATHIS]**:  None.
>
> **Q**:  Did you have time to gather medical records yourself?
>
> **[MATHIS]**:  We got in it too late.  We did good to prepare with what we did do.
>
> **Q**:  You didn't have a strategic reason?
>
> **[MATHIS]**:  No.

State Court—Collateral Transcript, Vol. 15, at 136–37.

Now, bearing in mind that this is the <u>only</u> testimony about the mitigation investigation, we have three factual claims: (1) Mathis did not hire an outside investigator; (2) Mathis did not collect school records; and (3) Mathis did not

67

collect medical records.  DeBruce cites (and the majority credits) this testimony as establishing a complete "failure to investigate," on all fronts, by both attorneys. Pet'r's Br. at 67.

Plainly, those things are not the same.  Are they close?  Maybe.  Relevant? Surely.  But dispositive, such that we can say that DeBruce carried his burden? Absolutely not.  First of all, the argument is highly selective: it fails to account for the possibility that the attorneys took steps other than the three Mathis was asked about, or that the attorneys learned of the relevant information from other sources. Second, DeBruce's questioning of Mathis sheds no light on the attorneys' strategy for the penalty phase, or on whether DeBruce's supposedly "new" mitigation evidence would have caused them to change their strategy.

1.

If DeBruce wants to hang his hat on the claim that his attorneys did nothing, Strickland requires that he actually account for their time.  It is not enough to cherry-pick particular omissions and then extrapolate from those a total "failure to investigate."  See Pet'r's Br. at 67.  "The [Strickland] presumption impacts on the burden of proof and continues throughout the case, not dropping out just because some conflicting evidence is introduced."  Chandler, 218 F.3d at 1314 n. 15.  The

need for reviewing courts to be "vigilant and independent," Harrington, __ U.S. at __, 131 S. Ct. at 780, in holding petitioners to their burden is especially acute when we evaluate attorney-ineffectiveness claims.  No one is better positioned to document the activities of a defendant's attorneys than the defendant himself: he has privileged access to their work product, and his recollections can be crucial if—as frequently happens—new attorneys take over the case on collateral attack.  Equally obvious is the danger that, if petitioners are not required to produce a thorough record, they might be tempted to omit information that weakens their claim of ineffectiveness.  Strickland's requirement that we presume effectiveness until we are convinced otherwise plays an important role in protecting the integrity of habeas proceedings: by enforcing it, courts ensure honest and meaningful review.  Lax enforcement, on the other hand, "would encourage the proliferation of ineffectiveness challenges.  Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense."  Strickland, 466 U.S. at 690, 104 S. Ct. at 2066.

Here, brief testimony that Mathis did not take a particular action does not establish that the attorney (or his unmentioned co-counsel) took no action at all, nor does Strickland allow us to extrapolate from a decision not to take action X that the attorney must have also not taken action Y or Z.  Mathis's testimony certainly does not establish that "Mathis [or DelGrosso] did not interview any

69

members of DeBruce's family," Pet'r's Br. at 64, or that "Mathis [or DelGrosso] never examined the [Garner] report," id. at 65, claims that DeBruce asserts (and the majority accepts) without citation.  Nor does the testimony address the possibility that the attorneys pursued avenues of investigation other than the three narrow ones Mathis was asked about.  See Titlow, __ U.S. at __, 134 S. Ct. at 18 ("The record does not reveal how much [the defense attorney] was able to glean about respondent's case from other sources; he may well have obtained copies of the critical materials from prosecutors or the court.").  Mathis was not even able to say definitively that the unnamed "other people in [his] office" did not help him prepare for trial: "I think at that time all we had was me and Bill [DelGrosso].  I don't think we had anybody else helping us on this case."  State Court—Collateral Transcript, Vol. 15, at 180–81 (emphasis added).  The majority—in a neat demonstration of its methodology—says that Mathis's hazy recollections make it "clear that the only person Mathis had helping him was DelGrosso," Maj. Op. at 18 (emphasis added), even though the Supreme Court rejected an identical argument in Pinholster: "[A] handful of post-hoc nondenials by one of [petitioner's] lawyers" is not enough to overcome Strickland's presumption that both lawyers performed effectively.  See __ U.S. at __, 131 S. Ct. at 1406.

The attorneys may well have gotten everything they needed from their client, or their client's mother.  We know that DeBruce met with his lawyers

70

"many times," but we do not know what they talked about. See State Court—Trial Transcript, Vol. 1, at 12. The content of these conversations is important because the reasonableness of a lawyer's investigation is shaped by information and guidance from his client. See Strickland, 466 U.S. at 691, 104 S. Ct. at 2066 ("In particular, what investigation decisions are reasonable depends critically on [information supplied by the defendant]."). DeBruce offers no documentary record of his attorneys' investigation—no billing records, no time sheets, no notes, nothing—and so he has to rely on testimonial evidence. The universe of possible witnesses to the attorney-client conversations is a limited one: it could come either from the two lawyers, from DeBruce's mother (who retained Mathis), or from DeBruce himself.

Neither DeBruce nor his mother testified at the Rule 32 proceeding. In a criminal case, of course, DeBruce's failure to testify would be irrelevant. See U.S. Const. amend. V; Griffin v. California, 380 U.S. 609, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965). But habeas corpus is a civil action, Hilton v. Braunskill, 481 U.S. 770, 776, 107 S. Ct. 2113, 2119, 95 L. Ed. 2d 724 (1987) ("Our decisions have consistently recognized that habeas corpus proceedings are civil in nature."), and the burden of proof shifts from the State to the petitioner, who has to prove "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," Strickland, 466 U.S. at 687,

104 S. Ct. at 2064.  DeBruce claims that his attorneys knew nothing about his background when they made decisions about mitigation, but to prove that he would need to shed some light on what he (or his mother) told the attorneys.

Presumably, DeBruce chose not to testify at the Rule 32 hearing because he wanted to avoid cross-examination about other crimes—like the attempted armed robbery of the City National Bank in Sylacauga—and because Alabama does not have a statute of limitations for violent crimes.  See Ala. Code § 15-3-5(a)(2).  Nonetheless, DeBruce knows what he said to his lawyers and what they said to him, and he has not shared that information with the Rule 32 court or with us.  Nor did he call his mother or DelGrosso as witnesses, or ask Mathis about the conversations they had before trial.  It was within DeBruce's power to document these critical attorney-client conversations, and he failed to do so.

At common law, a plaintiff who failed to call an essential witness made himself vulnerable to the so-called "missing witness rule," whereby a court can draw an inference against a party who inexplicably fails to produce a witness whose testimony would be crucial to resolving the case.  See Graves v. United States, 150 U.S. 118, 121, 14 S. Ct. 40, 41, 37 L. Ed. 1021 (1893) ("The rule, even in criminal cases, is that, if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be

72

unfavorable."); Creel v. Comm'r, 419 F.3d 1135, 1142 (11th Cir. 2005) ("It is well settled that the production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse." (quoting Raley, Inc. v. Kleppe, 867 F.2d 1326, 1329 (11th Cir. 1989)).[4] Strickland embodies a modern missing witness rule insofar as it operates as a kind of evidentiary presumption: "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," and a petitioner cannot prevail unless he convincingly proves otherwise. 466 U.S. at 690, 120 S. Ct. at 2066.

---

[4] See also Sparkman v. Comm'r, 509 F.3d 1149, 1155 n.5 (9th Cir. 2007) ("Where the burden of production rests on a party, a court may, at its discretion, presume or infer from that party's failure to call a witness that the testimony the witness would have offered would not favor that party."); United States v. Pagan-Santini, 451 F.3d 258, 267 (1st Cir. 2006) ("[A missing witness] instruction may be given where a party controls or has peculiar access to a witness and, in the circumstances, it may be reasonable to suppose that the party would produce the witness unless the testimony was unfavorable."); Streber v. Comm'r, 138 F.3d 216, 221–22 (5th Cir. 1998) ("In general, a court may draw a negative inference from a party's failure to produce a witness 'whose testimony would elucidate the transaction.'" (quoting Graves v. United States, 150 U.S. 118, 121, 14 S. Ct. 40, 41, 37 L. Ed. 1021 (1893))); Gumbs v. Int'l Harvester, Inc., 718 F.2d 88, 96 (3d Cir. 1983) ("The unexplained failure or refusal of a party to a judicial proceedings to produce evidence that would tend to throw light on the issues authorizes, under certain circumstances, an inference or presumption unfavorable to such party."); United States v. Tucker, 552 F.2d 202, 210 (7th Cir. 1977) ("Like all sound inferences, the missing witness inference is rooted in notions of common sense, specifically that where a party fails to call an available witness with important and relevant knowledge, it may be that he has something to fear in the witness' testimony."); see generally 2 McCormick on Evidence § 264 (7th ed.) ("When it would be natural under the circumstances for a party to call a particular witness, or to take the stand as a witness in a civil case, or to produce documents or other objects in his or her possession as evidence[,] and the party fails to do so, tradition has allowed the adversary to use this failure as the basis for invoking an adverse inference.") (footnotes omitted).

Because DeBruce did not produce the available witnesses—himself, his mother, or DelGrosso—or ask Mathis about his mitigation strategy, DeBruce is unable to rebut the possibility that "[t]rial counsel could reasonably surmise from his conversations with [the defendant] that character and psychological evidence would be of little help." See Strickland, 466 U.S. at 699, 104 S. Ct. at 2071. Likewise, he is unable to substantiate the claim that his attorneys were "unaware of [his] upbringing," Maj. Op. at 26, because he presents no evidence about what his attorneys knew before trial. DeBruce's pre-trial interactions with his attorneys are a black box, and his inability—or unwillingness—to document those interactions makes it impossible to rebut the "strong presumption that [the attorneys acted] for tactical reasons rather than through sheer neglect." See Yarborough, 540 U.S. at 8, 124 S. Ct. at 5 (citing Strickland, 466 U.S. at 690, 104 S. Ct. at 2066).

2.

DeBruce's questioning of Mathis at the Rule 32 hearing is deficient in another respect: it sheds no light on the attorneys' strategy for the penalty phase. An omission, standing alone, is meaningless under Strickland; what matters is the reasonableness of the omission, which turns "on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690, 104 S. Ct. at 2066 DeBruce never asked Mathis about strategy, and is thus unable to disprove the

74

presumption that the lawyers had good reasons for acting as they did.  Cf. Massaro v. United States, 538 U.S. 500, 505, 123 S. Ct. 1690, 1694, 155 L. Ed. 2d 714 (2003) ("The appellate court may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive or was taken because the counsel's alternatives were even worse.").  Without a sufficiently developed factual record, a petitioner is merely asking the court to speculate about an attorney's activities or motives, an exercise forbidden to us by Strickland and AEDPA.  Cf. Guinan v. United States, 6 F.3d 468, 473 (7th Cir. 1993) (Easterbrook, J., concurring) ("[T]he absence of a complete record prevents definitive action.  No matter how odd or deficient trial counsel's performance may seem, that lawyer may have had a reason for acting as he did.") (quoted with approval in Massaro, 538 U.S. at 505, 123 S. Ct. at 1694).  Here, we cannot say the attorneys acted unreasonably because we do not know anything, one way or the other, about their reasoning.

## C.

Instead of holding DeBruce to his burden of proof and critically examining whether what DeBruce says the evidence shows is congruent with what the evidence actually is, the majority accepts the claims in DeBruce's brief in their entirety.  Actually, the majority goes further, inventing "facts" that even DeBruce did not assert.  According to the majority, the defense attorneys "fail[ed] to take

75

even the first step of asking DeBruce and his mother about the information in the [Garner] report." Maj. Op. at 23. This is total speculation: there is exactly zero testimony to that effect, and DeBruce did not make the claim in his brief. The exasperating thing is that the majority could be right—but if they are, it is because they guessed, not because DeBruce presented any evidence establishing the point.

Alternatively, the majority could be dead wrong: maybe Mathis and DelGrosso did ask DeBruce and his mother about information in the report. Maybe, as the State suggests, DeBruce and his mother actively misled the attorneys about their client's background and told Mathis that the report was nonsense, leading Mathis to "tailor[] his investigation decisions to the information he received from his client and his client's mother," see Gov't. Br. at 45–46, something the Supreme Court in Strickland explicitly said attorneys should do, 466 U.S. at 691, 104 S. Ct. at 2066 ("Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant."), and something our circuit has found dispositive in dismissing ineffective-assistance claims, see, e.g., Williams v. Head, 185 F.3d 1223, 1237 (11th Cir. 1999) ("An attorney does not render ineffective assistance by failing to discover and develop evidence of childhood abuse that his client does not mention to him.").

76

Or, as long as we're indulging baseless speculation, maybe Mathis and DelGrosso asked DeBruce and his mother about the report and learned information that led them to believe a mental health mitigation strategy would be counterproductive. See Strickland, 466 U.S. at 691, 104 S. Ct. at 2066 ("[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable."). Or maybe the attorneys followed up on the report only to conclude—given what they knew of the jury, or of their client, or of the evidence they expected to uncover—that it would make for a weak argument and that they would be better off trying something else. See id. ("[W]hen the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether."); see also Harrington, __ U.S. at __, 131 S. Ct. at 788 ("Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.").

We just don't know: Mathis was not asked about the Garner Report, DelGrosso did not testify, and DeBruce does not offer any other information. That should be the end of it. Instead, the majority rewards DeBruce for his incomplete presentation and overturns a reasoned State court decision on nothing more than

77

the majority's self-proclaimed powers of divination.  We should be more than a claim-laundering service for underdeveloped habeas petitions; if we were going to let DeBruce write his own habeas writ, we could have done that without two decades of inconclusive litigation.

### III.

The majority today has misapplied AEDPA in a general sense by failing to hold DeBruce to his burden of proof under § 2254(d), but the majority also misapplies AEDPA in the specific context of Strickland.  The Court of Criminal Appeals concluded that DeBruce's attorneys pursued a "beg for mercy" strategy at the sentencing phase of trial.  See DeBruce, 890 So. 2d at 1093–94.  Because the majority believes, in its independent judgment, that a competent lawyer would have gone all-out in an effort to humanize DeBruce and generate sympathy for him in the eyes of the jury, the majority reverses a State court decision as "unreasonable" only in the sense that the majority would have decided DeBruce's case differently had they been sitting on the State bench.

The majority's casual second-guessing of the Court of Criminal Appeals ignores clear Supreme Court guidance on the application of AEDPA to Strickland claims.  Our task is first to make a sincere effort "to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time," Strickland, 466 U.S. at 689, 104 S. Ct. at 2065, followed

78

by an equally sincere effort to "determine what arguments or theories supported" or "could have supported[] the state court's decision," Harrington, __ U.S. at __, 131 S. Ct. at 786 (emphasis added).   We are "required not simply to give [the] attorneys the benefit of the doubt, but to affirmatively entertain the range of possible reasons [the petitioner's] counsel may have had for proceeding as they did." Pinholster, __ U.S. at __, 131 S. Ct. at 1407 (first alteration in original, quotation marks and citations omitted).   I will first evaluate DeBruce's petition according to this guidance from the Supreme Court, and then show how the majority bypasses these steps by substituting its own Strickland analysis for that of the State court.

## A.

Reconstructing events from the attorneys' perspective at the time, we start with Mathis's testimony that—based on his interactions with his client—he did not believe anything was mentally or physically wrong with DeBruce.  "[H]e seemed about as attentive as people would [be] under the circumstances," Mathis said. State Court—Collateral Transcript, Vol. 15, at 173.  "We would all of us criminal defense lawyers on a capital murder case like to have a client with 120 IQ who could talk to us like we could talk to them, but unfortunately that never happens. So you get used to it in this business.  And I assumed that Derrick was not real bright, that he could get by, but that he was not real bright, that I was going to have

79

to do most of this myself, and reacted accordingly so." Id. at 174. The trial judge corroborated this observation at the Rule 32 hearing: "I sat here and watched [DeBruce], and he wasn't in pain when I was trying him that week. He would rather have been somewhere else I'm sure, but there wasn't physically anything wrong with him. I observed him throughout the trial. He even got up and made part of the closing argument in the sentencing phase. Didn't appear to have any difficulty." Id. at 276.

But rather than relying on his observation of DeBruce or his conversations with his client (Mathis said that he "spoke with [DeBruce] many times," State Court—Trial Transcript, Vol. 1, at 12), Mathis asked the court to have DeBruce evaluated. The record shows that Mathis was motivated to ask for the evaluation because of "some information I was given by this defendant's mother prior to having the opportunity to speak at length with him." Id. Mathis was plainly attentive to the possibility that whatever "some information" was would be relevant to the penalty phase, because he made clear that the evaluation—what would become the Garner Report—"would be for the purposes of the punishment phase of the trial . . . if it comes down to it." Id. at 12–13. Because there is no evidence to the contrary, Strickland requires us to assume that Mathis and DelGrosso reviewed the Garner Report and considered its usefulness as they planned for trial. See 466 U.S. at 690, 104 S. Ct. at 2066.

80

Here the attorneys would come to a fork in the road, and we have to ask: having reviewed the report, could reasonable attorneys make the decision to pursue a beg-for-mercy strategy in the penalty phase, as opposed to a humanization defense or a defense based on mental health?  The Supreme Court, our court, and the Alabama Supreme Court have all held that they could.  Attorneys are not required to exhaust every line of investigation before making tactical decisions. "There comes a point where a defense attorney will reasonably decide that another strategy is in order, thus 'mak[ing] particular investigations unnecessary.'" Pinholster, __ U.S. at __, 131 S. Ct at 1407 (alteration in original, quoting Strickland, 466 U.S. at 691, 104 S. Ct. at 2066).  The Supreme Court in Burger noted that "[t]he record at the habeas corpus hearing does suggest that [the defense attorney] could well have made a more thorough investigation than he did," but the Court held he was not required to.  483 U.S. at 794–95, 107 S. Ct. at 3126. "[T]here comes a point at which evidence . . . can reasonably be expected to be only cumulative, and the search for it distractive from more important duties." Bobby v. Van Hook, 558 U.S. 4, 11, 130 S. Ct. 13, 19, 175 L. Ed. 2d 255 (2009).

Our court has said that "[b]y its nature, 'strategy' can include a decision not to investigate . . . [and] a lawyer can make a reasonable decision that no matter what an investigation might produce, he wants to steer clear of a certain course." Rodgers v. Zant, 13 F.3d 384, 387 (11th Cir. 1994).  We do not require attorneys to

81

"pursue every path until it bears fruit or until all hope withers." Williams, 185 F.3d at 1237 (quoting Foster v. Dugger, 823 F.2d 402, 405 (11th Cir. 1987)). "Counsel is not required to present every nonfrivilous defense; nor is counsel required to present all mitigation evidence, even if the additional mitigation evidence would not have been incompatible with counsel's strategy." Chandler, 218 F.3d at 1319; see also Tarver v. Hopper, 169 F.3d 710, 715 (11th Cir. 1999) (noting that lawyers are "not required to investigate and present all available mitigating evidence to be reasonable"); Waters v. Thomas, 46 F.3d 1506, 1511 (11th Cir. 1995) (en banc) ("Our decisions are inconsistent with any notion that counsel must present all available mitigating circumstance evidence, or all available mental illness or impairment evidence, in order to render effective assistance of counsel at the sentencing stage."). If we ourselves have given such wide latitude to defense counsel, and if the Supreme Court has repeatedly rejected "the notion that the same investigation will be required in every case," Pinholster, __ U.S. at __, 131 S. Ct. at 1406–07, then it cannot have been unreasonable for the Court of Criminal Appeals to say here that DeBruce failed to show that his attorneys were incompetent.

Things might be different if a client is "fatalistic and uncooperative." Porter v. McCollum, 558 U.S. 30, 40, 130 S. Ct. 447, 453, 175 L. Ed. 2d 398 (2009) (per curiam). If an attorney has reason to think his client is not forthcoming, he might

82

need to take further steps to uncover things his client is trying to conceal. Certainly, he will need to have more than "one short meeting" with his client before sentencing, as the inexperienced defense lawyer in <u>Porter</u> did. <u>Id.</u> at 39, 130 S. Ct. at 453. But DeBruce was not fatalistic or uncooperative; the evidence we have shows him participating extensively in his own defense. He met many times with Mathis before trial. He addressed the court directly on a mid-trial suppression motion. And he addressed the jury on his own behalf in the penalty phase of the trial. The Court of Criminal Appeals could have reasonably believed that DeBruce's lawyers, in consultation with their client, considered and rejected the mitigation strategy that DeBruce now, in retrospect, urges as the only viable path forward. Debruce presents no evidence to prove otherwise.

Bearing in mind that "[t]here are countless ways to provide effective assistance in any given case," <u>Strickland</u>, 466 U.S. at 689, 104 S. Ct. at 2065, we also must ask whether Mathis and DelGrosso might have had reason to be wary of focusing on DeBruce's background at sentencing. Competent lawyers could have many reasons for not taking the humanization route. Mathis and DelGrosso—both experienced attorneys familiar with local conditions and juries—might have concluded that the jury would not find a defense based on DeBruce's background persuasive. Take, for instance, DeBruce's new mental health mitigation evidence. At the Rule 32 hearing, DeBruce contended that he suffers from brain damage and

83

offered an expert, Dr. David Williamson, to testify that he found "clear evidence for brain dysfunction from Mr. DeBruce." State Court—Collateral Transcript, Vol. 17, at 32. The State responded with its own expert, Dr. Glen King, who testified that DeBruce "suffers from no serious mental illness or mental defect," id. at 232, and that, in Dr. King's opinion, DeBruce "was malingering psychological and psychiatric symptoms," id. at 237—that is, that DeBruce was faking it to evade punishment.

"Evaluat[ing] the conduct from counsel's perspective at the time," Strickland, 466 U.S. at 689, 104 S. Ct. at 2065, the lawyers would have been aware of the risks of a mental health mitigation defense. Maybe the attorneys would get lucky, and the jury would patiently endure long stretches of tedious cross-examination as the parties labored to discredit the other side's expert. See, e.g., State Court—Collateral Transcript, Vol. 17, at 259–86. Maybe the jury would gladly dive into the details of the Minnesota Multiphasic Personality test, id. at 233, the Instructed Interview Reported Systems test, id. at 237–38, and the Wechsler Adult Intelligence Scale, id. at 236. And maybe, after extended squabbling about standardization procedures and norming and clinical validity, the jury would credit the defense expert over the State expert and conclude that DeBruce is mentally impaired.

But maybe they wouldn't.  Maybe the jury would find the State expert more credible, or maybe the jury would simply find the battle of the experts exhausting and default to their own observations of DeBruce in the course of trial.  Now the defense could be in real trouble: they have exposed their client, whom the jury just convicted of a cold-blooded murder, to accusations of faking brain dysfunction to avoid responsibility for his crime.  In doing so, the attorneys might undermine their own credibility in front of the jury and undercut whatever sympathy jurors might feel for their client.  The mental health mitigation strategy that DeBruce advocates in hindsight would not have been risk-free from the perspective of his attorneys at the time.  See Harrington, __ U.S. at __, 131 S. Ct. at 790 (finding that counsel was not ineffective for foregoing expert testimony where "there was the possibility that expert testimony could shift attention to esoteric matters of forensic science, distract the jury . . . or transform the case into a battle of the experts.").

Obviously, different lawyers will evaluate these risks differently; "[e]ven the best criminal defense attorneys would not defend a particular client in the same way."  Strickland, 466 U.S. at 689, 104 S. Ct. at 2065.  That is why Strickland does not allow us to assume that certain kinds of mitigation strategies are obviously superior to others.  "The current infatuation with 'humanizing' the defendant as the be-all and end-all of mitigation disregards the possibility that this may be the wrong tactic in some cases because experienced lawyers conclude that the jury

85

simply won't buy it."  Pinholster, __ U.S. at __, 131 S. Ct. at 1408 (quoting Pinholster v. Ayers, 590 F.3d 651, 692 (9th Cir. 2009) (en banc) (Kozinski, C.J., dissenting) rev'd __ U.S. at __, 131 S. Ct. at 1388).  "[A]pplying a heavy measure of deference to counsel's judgments," Strickland, 466 U.S. at 691, 104 S. Ct. at 2066, we cannot discount the possibility that DeBruce's attorneys considered these risks and decided against the approach DeBruce and the majority now endorse. And because DeBruce offers no evidence to rebut that possibility, we certainly cannot say the Court of Criminal Appeals was unreasonable for thinking that "counsel made such a reasoned decision in this case."  Pinholster, __ U.S. at __, 131 S. Ct. at 1408.

DeBruce's lawyers appear to have decided that the best course was to try and elicit sympathy not for their client but for his family.  See id. at __, 131 S. Ct. at 1407 ("[I]t certainly can be reasonable for attorneys to conclude that creating sympathy for the defendant's family is a better idea because the defendant himself is simply unsympathetic.").  Thus, DeBruce's lawyers offered testimony from the defendant's mother: "I'm asking y'all to please to think about me and my child.  I love him and you love yours and I'm begging y'all try not to give him the death penalty.  Let him live."  State Court—Trial Transcript, Vol. 7, at 1136–37.[5]

---

[5] The majority thus misses the point when it describes Jessie DeBruce's testimony as "grossly inaccurate."  Maj. Op. at 16.  That criticism only makes sense if you believe that humanization is the only appropriate defense strategy; it ignores the possibility that the lawyers

DeBruce's own statement to the jury centered on his affection for his mother and his own child: "I have a son who is one year old and my mother. I love my mother. I love my son." Id. at 1169. In his closing, DelGrosso appealed to the jurors as parents: "How many of you have kids that have done the most absolute stupid things? They go out and do it and it is stupid. It's just stupid, but do we kill that kid? No, we don't kill him." Id. at 1172. The prosecutor certainly understood this as a family sympathy defense. He began his closing statement by acknowledging that the jury had "just witnessed as good a guilt trip, as heavy a burden that anybody can place upon your shoulders." Id. at 1174. He responded directly to DeBruce's appeal to family: "I love my mother; I love my son. . . . All of those things apply to Doug Battles [sic]. All of those things apply to the Battles [sic] family." Id. at 1176.

Focusing on DeBruce's family also deprived the State of the opportunity to respond with additional evidence in rebuttal. See Wong v. Belmontes, 558 U.S. 15, 25, 130 S. Ct. 383, 389, 175 L. Ed. 2d 328 (2009) ("The type of 'more-evidence-is-better' approach advocated by [defendant] . . . might seem appealing—after all, what is there to lose? But here there was a lot to lose. A heavyhanded

---

intended to arouse sympathy not for DeBruce but for DeBruce's family. If the lawyers could present DeBruce as the wayward son of a hardworking, close-knit, blue collar family, the jurors might take mercy on the family and spare them the pain of their son's execution. This is "the sort of calculated risk that lies at the heart of an advocate's discretion." Yarborough, 540 U.S. at 10, 124 S. Ct. at 6.

87

case to portray [defendant] in a positive light . . . would have invited the strongest possible evidence in rebuttal."). Expert testimony about DeBruce's mental condition would invite rebuttal evidence from the State's expert that DeBruce was faking his condition to evade punishment. Testimony about DeBruce's background and upbringing would open the door to testimony about DeBruce's earlier criminal activities, including the spree of robberies or attempted robberies leading up to Douglas Battle's murder. Testimony about DeBruce's family might focus attention on DeBruce's siblings, many of whom were also incarcerated and who might not make ideal character witnesses, or who might undercut sympathy for DeBruce's mother by describing their childhoods as hellish. DeBruce's sister Jaquelline, for example, testified at the Rule 32 hearing that their mother approved of the eldest sister Juanita's heavy-handed disciplining of the other children: "My mother said she left [Juanita] in control over us and she can chastise us as she choose." State Court—Collateral Transcript, Vol. 15, at 355.

The defense team had to pick: they could appeal to the jury's sympathy for DeBruce's family, suggesting that as parents they should spare this "kid" who had done something "stupid," State Court—Trial Transcript, Vol. 7, at 1172, or they could try to manufacture sympathy for DeBruce himself, thereby inviting the State to introduce evidence that this "kid" was in fact a committed criminal. But the defense team could not do both. They made a tactical decision to take one road

88

instead of the other, and the fact that DeBruce now, in hindsight, wishes they made a different call does not mean that the attorneys were constitutionally ineffective. See Chandler, 218 F.3d at 1319 ("Considering the realities of the courtroom, more is not always better. Stacking defenses can hurt a case. Good advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others."). It was not unreasonable for the Court of Criminal Appeals to find that the attorneys' "strategy in the penalty phase was to beg for mercy," DeBruce, 890 So. 2d at 1093, and Strickland and AEDPA insulate that strategic decision from second-guessing.

### B.

Rather than "affirmatively entertain[ing] the range of possible reasons [petitioner's] counsel may have had for proceeding as they did," Pinholster, __ U.S. at __, 131 S. Ct. at 1407, the majority "treat[s] the unreasonableness question as a test of [their] confidence in the result [they] would reach under de novo review." Contra Harrington, __ U.S. at __, 131 S. Ct. at 786. The majority opinion advances two theories of ineffectiveness: first, that the attorneys must have failed to conduct an adequate investigation because they began their representation shortly before trial, and second, that the attorneys must have failed to pursue the investigative leads in the Garner Report relating to DeBruce's background and mental health.

Neither theory has definitive support in the record.  The majority nonetheless presents its speculation as certainty, and then goes further and says that it would be objectively unreasonable to disagree.  "Because the Court of Appeals had little doubt that [the petitioner's] Strickland claim had merit, the Court of Appeals concluded the state court must have been unreasonable in rejecting it."  Id. This approach reflects unbounded review, heedless of the limitations of Strickland and § 2254(d).  "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  Harrington, __ U.S. at __, 131 S. Ct. at 786.

The majority is forced to proceed by supposition because the facts in evidence do not get DeBruce very far.  After the Rule 32 hearing, the only specific claims are that the attorneys did not hire an investigator and did not retrieve DeBruce's school or medical records.  The majority does not say—and indeed cannot say—that this is prima facie evidence of ineffectiveness, because doing so would treat those omissions as mechanical, per se requirements for attorneys. Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; see also Chandler, 218 F.3d at 1313 ("To state the obvious: the trial lawyers, in every case, could have done something more or something different.  So, omissions are inevitable.  But, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" (quoting Burger, 483 U.S. at 794, 107 S. Ct. at

90

3126)).  And DeBruce has no evidence to rebut the possibility that the attorneys engaged in other, undocumented investigation activities, see Titlow, __ U.S. at __, 134 S. Ct. at 17, because he failed to question Mathis "about what investigations that he and DelGrosso conducted."  DeBruce, 890 So. 2d at 1085.  That is why the majority has to argue ineffectiveness by supposition.

The majority's first theory of ineffectiveness makes an inference about time.  Advancing a sort of res ipsa loquitur approach to Strickland, the majority claims that "counsel's testimony during the state collateral proceedings made clear that his failure to conduct adequate investigation was not the result of a strategic decision, but rather a result of lack of time as he scrambled to prepare for DeBruce's capital trial with less than four weeks' time while also preparing for and conducting other trials."  Maj. Op. at 24.

By now, we know that Mathis did not actually say that.  Mathis said only that he did not hire an outside investigator or gather academic or medical records.  State Court—Collateral Transcript, Vol. 15, 136–37.  Mathis did not say—because he was not asked—whether he (or DelGrosso) took other steps "to investigate DeBruce's mental health," nor was he asked about his overall strategy with respect to the penalty phase of his client's trial.  What the majority presents as fact here is just conjecture: because the attorneys were retained so close to trial, the majority

91

infers that they could not possibly have had time to conduct an adequate investigation or make an informed decision.

Of course the majority cites no Supreme Court case to support this temporal rule of attorney performance, because there is none. Under Strickland, our analysis would be the same whether the attorneys were retained one month before trial or one hour before trial. We would still need to make a reasonableness determination, which would still require us to know more about what the attorneys did before we could call them ineffective. The majority cannot hurdle the gaps in the evidence by drawing an inference from the amount of time the lawyers spent preparing for the case; the Strickland presumption points in the other direction, and to rebut it the majority needs more than guesswork and innuendo.

The majority's second theory of ineffectiveness—that the attorneys ignored the Garner Report—requires more attention. The majority believes that the Garner Report is their smoking gun, the red flag that would induce even a minimally competent attorney to probe for more information. We are told that the attorneys ignored the Garner Report by "failing to take even the first step of asking DeBruce and his mother about the information in the report," Maj. Op. at 23, and that even if the attorneys had not ignored it, their investigation would still have been inadequate because "no lawyer could reasonably have made a strategic decision to forego the pursuit of mitigation evidence based on" the Garner Report. Id. at 21.

92

Either way, the majority reasons, the lawyers must have performed ineffectively, and so surely the Court of Criminal Appeals was unreasonable to find otherwise.

For simplicity, I will divide the majority's theory into its factual and legal components. The factual claim—that the lawyers outright ignored the Garner Report—suffers from the now-familiar burden of proof problem: DeBruce presents no evidence one way or the other about how the attorneys used (or did not use) the Garner Report, and without that evidence, Strickland requires us to assume—as the State court did—that the attorneys used the report properly. The legal claim—that a pre-trial competency evaluation could never be an adequate basis on which to make mitigation decisions—is not supported by any particular Supreme Court holding but merely by the majority's "own sense of 'prudence.'" Pinholster, __ U.S. at __, 131 S. Ct. at 1407 (citation omitted). That approach ignores that "it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." Knowles, 566 U.S. at 121, 129 S. Ct. at 1419 (quotation marks omitted). That the majority would evaluate this case differently under Strickland does not mean that the Court of Criminal Appeals applied Strickland unreasonably.

Turning first to the suggestion that the attorneys ignored the Garner Report, the only testimony remotely on point was elicited by the attorney for the State, who

93

asked Mathis "whether [he] saw any reason to pursue a psychological defense in this case." Mathis replied that he had not, because "the [Garner Report] indicated that [DeBruce] was all right and we should go forward, and so we went forward from that point." State Court—Collateral Transcript, Vol. 15, at 174. No one stopped to clarify whether "psychological defense" referred to the guilt phase, the penalty phase, or both, or whether by "indicated" Mathis meant he had personally read the report or learned of its contents some other way.

This is the only testimony available to us, and the best we can say is that it is ambiguous. The majority reads Mathis to be saying that when DeBruce was found competent to stand trial, his lawyers simultaneously abandoned any hope of a mental health mitigation defense. See Maj. Op. at 21. If you assume, as the majority does, that Mathis and DelGrosso were buffoons, then you might agree here that Mathis betrayed a "failure to understand the law" of mitigation. Id.

But if instead you start with the "strong presumption that [the attorneys acted] for tactical reasons rather than through sheer neglect," Yarborough, 540 U.S. at 8, 124 S. Ct. at 5 (citing Strickland, 466 U.S. at 690, 104 S. Ct. at 2052), you would not assume that Mathis—an experienced and successful capital-defense attorney—was somehow unaware of the elementary legal distinction between guilt-phase competence and penalty-phase mitigation. That assumption is obviously false: this is one of the few things on which we actually have

94

contemporaneous record evidence, in the form of Mathis telling the trial judge that the Garner Report "would be for the purposes of the punishment phase of the trial . . . if it comes down to it."  State Court—Trial Transcript, Vol. 1, at 12–13. Mathis plainly understood what the penalty phase of a trial looks like, and he was thinking early on about how to prepare.  He said outright he was requesting the Garner Report as part of his penalty-phase investigation, "as opposed to me thinking that there is any way on God's earth that [DeBruce] is going to be determined by some expert to be insane."  Id.

The majority's interpretation of Mathis's ambiguous testimony at the collateral hearing is thus both inconsistent with Strickland's presumption of competence and contradicted by the trial record.  It is just as plausible, if not more so, to interpret Mathis as saying that he saw no reason to pursue a "psychological defense" at the guilt phase, as the Garner Report "indicated that [DeBruce] was all right and we should go forward" to trial.  See State Court—Collateral Transcript, Vol. 15, at 174.  DeBruce had the chance to clear this up at the Rule 32 hearing— Mathis was, after all, his witness—and he did not.

But, true to form, the majority is ready with the inverted burden of proof: "[T]here is no indication that Mathis's failure to develop the troubling leads in DeBruce's competency report was supported by a professional judgment not to pursue a mitigation investigation."  Maj. Op. at 25.  We need to take a step back

95

here, because that is not how Strickland works: the burden is on DeBruce to demonstrate what his attorneys did, or did not do, with the Garner Report. The majority instead takes absence of evidence as evidence of absence, and assumes that the lack of testimony ought to count in DeBruce's favor. This ambiguity is then breezily converted into a conviction that Mathis was "unaware of DeBruce's upbringing." Id. at 20; contra Titlow, __ U.S. at __, 134 S. Ct. at 17–18. Never mind that the Court of Criminal Appeals found as a factual matter that Mathis had reviewed the Garner Report, DeBruce, 890 So. 2d at 1092, meaning the burden is on DeBruce under § 2254(d)(2). DeBruce had no evidence to challenge the court's finding because he never asked Mathis about the Garner Report at the Rule 32 hearing, despite every opportunity to do so. We are required to assume, both by § 2254 and by Strickland, that the attorneys reviewed and thought about the report. Without unambiguous evidence to the contrary, we have no basis for calling the Court of Criminal Appeal's finding unreasonable.

Undaunted by the lack of evidence and indifferent to our posture of "doubly deferential" review, Yarborough, 540 U.S. at 6, 124 S. Ct. at 4, the majority goes on to lecture the Court of Criminal Appeals about its alleged misapplication of Strickland: "Because no lawyer could reasonably have made a strategic decision to forego the pursuit of mitigation evidence based on the [Garner] report governing competency to stand trial, the Alabama Court of Criminal Appeals' conclusion to

96

the contrary constitutes an unreasonable application of Strickland's performance

prong." Maj. Op. at 21. The claim here seems to be that because the Garner

Report was nominally a competency evaluation rather than a full-bore social

history, it was by definition an inadequate basis on which to make strategic

decisions regarding mitigation.

Even assuming the majority is right about this as a factual proposition—that

is, even if we assume, contra Strickland, that the Garner Report was the only

source of information relied on by the attorneys in planning for the penalty phase,

see Titlow, __ U.S. at __, 134 S. Ct. at 18—the Supreme Court has never endorsed

a per se rule that attorneys are unreasonable for curtailing an investigation after

reviewing something like the Garner Report, simply because that report is called a

competency evaluation. Indeed, if anything, the Court has said the opposite. In

Pinholster, the Ninth Circuit relied on Williams v. Taylor, 529 U.S. 362, 120 S. Ct.

1495, 146 L. Ed. 2d 389, Wiggins v. Smith, 539 U.S. 510, 125 S. Ct. 2456, 162 L.

Ed. 2d 360 (2003), and Rompilla, and

> drew from those cases a "constitutional duty to investigate," and the
> principle that "[i]t is prima facie ineffective assistance for counsel to
> 'abandon[] their investigation of [the] petitioner's background after
> having acquired only rudimentary knowledge of his history from a
> narrow set of sources.'" The [Ninth Circuit] explained that it could
> not "lightly disregard" a failure to introduce evidence of "excruciating
> life history" or "nightmarish childhood."

Pinholster, __ U.S. at __, 131 S. Ct. at 1406 (alterations in original, citations omitted).

The Ninth Circuit was reversed. Their reasoning "misapplied Strickland and overlooked 'the constitutionally protected independence of counsel and . . . the wide latitude counsel must have in making tactical decisions.'" Id. (quoting Strickland, 466 U.S. at 689, 104 S. Ct. at 2065). "The Court of Appeals erred in attributing strict rules to [the Supreme] Court's recent case law," id. at __, 131 S. Ct. at 1407, and failed "to affirmatively entertain the range of possible 'reasons [petitioner's] counsel may have had for proceeding as they did,'" id. (citations omitted). "There comes a point where a defense attorney will reasonably decide that another strategy is in order, thus 'mak[ing] particular investigations unnecessary.'" Id. (alteration in original, quoting Strickland, 466 U.S. at 691, 104 S. Ct. at 2066)).

The majority opinion does not engage with the Supreme Court's most recent decisions applying AEDPA to Strickland claims, like Pinholster and Harrington. Instead, the majority relies principally on Williams, from which they draw the principle that "decisions about whether to present a mental-health defense during the guilt phase are separate issues from the decision whether to investigate mitigation evidence during sentencing." Maj. Op. at 21 (emphasis in original). This platitude is both obvious and totally unhelpful; of course there's an analytical

distinction between preparing for the guilt phase and preparing for the penalty phase, but that tells us nothing about what these attorneys did in this case, or whether those actions were reasonable.  That the distinction exists, in the abstract, does not also establish that Mathis and DelGrosso failed to appreciate it or act on it.  See Roe v. Flores-Ortega, 528 U.S. 470, 478, 120 S. Ct. 1029, 1035, 145 L. Ed. 2d 985 (2000) ("The Court of Appeals failed to engage in the circumstance-specific reasonableness inquiry required by Strickland, and that alone mandates vacatur and remand.").  Williams certainly does not contain the categorical language the majority tries to squeeze from it; even the majority's preferred language from Williams—that mitigating evidence "may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case," 529 U.S. at 398, 120 S. Ct. at 1516 (emphasis added) (quoted at Maj. Op. at 20)—is phrased conditionally, and does not resemble a mechanical rule that attorneys must conduct a particular kind of investigation before they make tactical decisions about mitigation.[6]

---

[6] I also wonder why the majority is talking about Williams at all in the part of their opinion about attorney performance.  Williams was decided on the prejudice prong of Strickland: the Virginia Supreme Court was held to have misinterpreted the application of Lockhart v. Fretwell, 506 U.S. 364, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993), to Strickland's prejudice standard.  See Williams, 529 U.S. at 391, 120 S. Ct. at 1512.  There was no actual dispute in Williams about performance—the state judge who sentenced Williams had found counsel's performance deficient, id. at 370, 120 S. Ct. at 1501, the Virginia Supreme Court "assumed, without deciding, that trial counsel had been ineffective," id. at 371, 120 S. Ct. at 1501, and the State "barely disputed" that point in its brief, id. at 395, 120 S. Ct. at 1514—and so the Court's disquisition about performance was dicta: it says nothing about a case like DeBruce's, where we

99

The majority bandies the distinction between guilt-phase competence and penalty-phase mitigation around like it is some kind of profound insight lost on the Court of Criminal Appeals. The majority opinion asserts that the State court "erroneous[ly] conflate[ed] . . . the issues of guilt-phase mental health defenses and competence to stand trial with the separate issue of whether to conduct a mitigation investigation." Maj. Op. at 21. As a preliminary matter, that statement would probably come as a surprise to the author of the Court of Criminal Appeals opinion, Judge Wise. She wrote, "we hold that Mathis was not ineffective for failing to investigate further into DeBruce's mental health," DeBruce, 890 So. 2d at 1093, in a section of the opinion that begins "DeBruce also argues that his counsel was ineffective in the penalty phase for failing to investigate." Id. at 1088 (emphasis added). Judge Wise went on to discuss other cases involving "a claim that counsel's performance was deficient for failing to present mitigation evidence of the defendant's abusive childhood," id. at 1092, and ended by considering the application of Wiggins "when reviewing a claim of ineffective assistance of counsel at the penalty phase of a capital trial," id. at 1093 (emphasis added). To

must apply AEDPA when a state court finds an attorney competent and the petitioner disagrees. Coincidentally, Williams was also the case establishing that AEDPA is concerned with "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Id. at 412, 120 S. Ct. at 1523 (emphasis added). And so, by relying on dicta from a case, decided on a different posture of review, that also post-dates DeBruce's trial by about a decade, the majority pulls off a kind of dubious hat trick, getting Williams wrong in just about every relevant way.

100

put it simply, Judge Wise understands what the penalty phase of a trial looks like, and understands the distinction between competence and mitigation.  To put it even more simply: Judge Wise is not a dolt, and the majority's eagerness to assume otherwise is not consistent with AEDPA.  See Titlow, __ U.S. at __, 134 S. Ct. at 13 ("[AEDPA] and Strickland . . . do not permit federal judges to so casually second-guess the decisions of their state-court colleagues or defense attorneys.") (citations omitted); see also Woodford v. Visciotti, 537 U.S. 19, 24, 123 S. Ct. 357, 360, 154 L. Ed. 2d 279 (2002) ("This readiness to attribute error is inconsistent with the presumption that state courts know and follow the law.").

The majority's real disagreement with Judge Wise is not about her "conflating" elementary legal concepts, but over the content of her court's judgment.  The Court of Criminal Appeals believed that DeBruce and his mother actively misled the defense attorneys (and maybe everyone else) about DeBruce's background, and relied on the long line of cases—including Strickland—holding that a defendant cannot dissuade his attorney from investigating a particular line of defense and then later, in a collateral proceeding, turn around and challenge the attorney's conduct as unreasonable.  See 466 U.S. at 691, 104 S. Ct. at 2066 ("Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.  In particular, what investigation decisions are reasonable depends critically on such

101

information.") (emphasis added).  Judge Wise noted that DeBruce said one thing to Gary Garner (resulting in the Garner Report, which the majority assumes contains the truth), another thing to the probation officer who prepared the post-trial, presentence report, see DeBruce, 890 So. 2d at 1092 ("[DeBruce] reported a good relationship with both of his parents and his numerous siblings.  There were no significant problems noted during his formative years. . . . DeBruce claims to have attended high school at Ramsey, in Birmingham, Alabama[,] and was in the 'Gifted' program.  The Probation Office report from Birmingham indicated that DeBruce finished high school at Hayes High School.  DeBruce then attended the University of Alabama in Birmingham for one semester.") (quoting the Probation Office's post-trial presentence report), and said perhaps a third thing to his attorneys.  Of course, we can't be sure about that last one because DeBruce offered no evidence at the Rule 32 hearing about the substance of his conversations with his lawyers.  "Given DeBruce's mother testimony [sic], DeBruce's own comments, and the conflicting expert testimony about DeBruce's mental health, [the Court of Criminal Appeals held] that Mathis was not ineffective for failing to investigate further into DeBruce's mental health."  Id. at 1093.

The majority does not even pretend to engage with that court's reasoning.  Instead, mimicking the error for which the Sixth Circuit was reversed in Harrington, the majority "treat[s] the unreasonableness question as a test of its

102

confidence in the result it would reach under de novo review." __ U.S. at __, 131 S. Ct. at 786. Hence the majority's conviction that the attorneys "never confronted DeBruce or his mother with these inconsistencies [in DeBruce's account of his background] in order to discover the truth, nor did [they] follow up on the [Garner Report]." Maj. Op. at 22. At bottom, what the majority tries to portray as a legal disagreement is really a factual one: the majority reads the record differently, and then conflates this with the reasonability determination required by AEDPA. See Knowles, 556 U.S. at 126, 129 S. Ct. at 1421 ("Here, the Court of Appeals failed even to mention the clearly-erroneous standard, let alone apply it, before effectively overturning the lower court's factual findings related to counsel's behavior.").

All this eventually returns us to the burden of proof, which rests on DeBruce: if he wants to claim that his attorneys never discussed his background with him, or never asked him about the contents of the Garner Report, he needs to actually prove that those conversations never happened. Otherwise, Strickland's strong presumption of competence requires us to assume, as the Alabama court did, that the defense lawyers reviewed the Garner Report, discussed it with their client, and made a tactical decision to go in a different direction. DeBruce had every opportunity to rebut that presumption during his direct examination of Mathis at the Rule 32 hearing; it would have been simple to ask Mathis about the

103

Garner Report, about DelGrosso's involvement, about the attorneys' interactions with their client and his family, and so on.  But those questions were not asked.

Where does that leave us?  The answer should be easy: DeBruce's petition turns on the substance of conversations between DeBruce and his attorneys that we know nothing about, and this "absence of evidence cannot overcome" Strickland's presumption of effectiveness, Titlow, __ U.S. at __, 134 S. Ct. at 17, let alone overcome the deference we owe to the State court under AEDPA.  But instead of applying AEDPA, we rewrite the record to include "facts" to which nobody testified, contra id.; we announce new rules of attorney performance, shakily derived from the dicta of cases decided years after DeBruce's trial, contra Pinholster, __ U.S. at __, 131 S. Ct. at 1406–07; and we ignore the Court of Criminal Appeals' decision almost entirely, unless it is to insinuate that our State-court colleagues do not know what the penalty phase of a trial looks like, contra Harrington, __ U.S. at __, 131 S. Ct. at 786.  I would have thought that seeing our sister circuits get reversed for these errors would give us some pause before rolling them all into one opinion.

## IV.

It is hard to say what principle guides the majority's prejudice analysis.  As far as I can tell, today's opinion holds that if a petitioner can produce mitigating evidence in a collateral proceeding that was not presented at trial, then federal

104

judges should find prejudice if they are convinced—in their independent judgment—that the new evidence is sufficiently "powerful" or "compelling."  Maj. Op. at 18.  Of course it is not so simple.

The Alabama court was reasonable in finding no prejudice.  Though the majority does its best to wring every last drop of pathos from the testimony, the new mitigation case is merely (1) that DeBruce was diagnosed with a painful intestinal disorder two years after his conviction, (2) that DeBruce is a person of low-to-average intelligence, and (3) that he grew up poor in a bad neighborhood.  Those circumstances are, indeed, unfortunate.  On the other hand, many individuals in equally unfortunate circumstances do not go on to murder AutoZone customers.  The majority never spells out exactly how DeBruce's "powerful" and "compelling" mitigation evidence would have helped him at trial.  Even DeBruce does not argue that his intelligence or his childhood explain, or lessen his culpability for, the murder of Douglas Battle.  They are, I suppose, just reasons to feel sorry for him.  But that is not enough.

The Alabama court conducted the prejudice analysis required by Strickland, "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence," Wiggins, 539 U.S. at 534, 123. S. Ct. at 2542, and concluded that there was no reasonable probability of a different outcome.  Repeating its conclusion from the direct appeal of DeBruce's conviction, the court wrote:

Although we have reviewed 'worse' crimes of robbery-murder, the apparent cold-blooded, senseless, and unmerciful manner in which the defendant executed this crime impresses this Court as it did the trial judge.  Other than the general arguments for not imposing a punishment of death in any case, we find no reason to spare the defendant's life.

DeBruce, 890 So. 2d at 1091 (quoting DeBruce v. State, 651 So. 2d 599, 623 (Ala. Crim. App. 1993)).

Just as the majority ignored AEDPA in evaluating Strickland's performance element, the majority proceeds to examine the prejudice element as though § 2254 does not exist.  The majority sets out its own prejudice analysis—relying principally on Eleventh Circuit cases instead of the Supreme Court cases relevant to § 2254—and then concludes that the Court of Criminal Appeals was "unreasonable" because they reached a conclusion different from the majority's. But the Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'  Even if the Court of Appeals might have reached a different conclusion as an initial matter, it was not an unreasonable application of our precedent for the [State court] to conclude that [the petitioner] did not establish prejudice."  See Pinholster, __ U.S. at __, 131 S. Ct. at 1411 (citations omitted, quoting Harrington, __ U.S. at __, 131 S. Ct. at 795).  The majority "d[oes] not observe this distinction, but ultimately substitute[s] their own judgment for that of the state court, in contravention of § 2254(d)."  Woodford, 537 U.S. at 25, 123 S. Ct. at 360.

106

In particular, the majority relies on various Eleventh Circuit cases for the principle that "the primary purpose of the penalty phase is to ensure that the sentence is individualized by focusing on the particularized characteristics of the defendant," Brownlee v. Haley, 306 F.3d 1043, 1074 (11th Cir. 2002), and says that a petitioner is necessarily prejudiced when omitted mitigation evidence "paints a vastly different picture of [the petitioner's] background than that created by" the evidence that was presented, Williams v. Allen, 542 F.3d 1326, 1342 (11th Cir. 2008).  For what it is worth, I think these sweeping statements—which reflect the humanization-above-all-else ethos rejected in Pinholster, see __ U.S. at __, 131 S. Ct. at 140—are inconsistent with Strickland's contextual, case-by-case standard; surely these statements cannot be taken literally, because a clever lawyer could "paint a vastly different picture" in a way that benefits his client by excluding even worse background information from the jury's consideration.  See Wong, 558 U.S. at 25, 130 S. Ct. at 389.  But that is not worth much, because Brownlee and Williams are not worth anything for AEDPA purposes: § 2254(d)(1) is concerned with "clearly established Federal law, as determined by the Supreme Court," not by panel decisions of the Eleventh Circuit.  See Parker v. Matthews, __ U.S. __, 132 S. Ct. 2148, 2155, 183 L. Ed. 2d 32 (2012) ("The Sixth Circuit also erred by consulting its own precedents, rather than those of the [Supreme] Court, in assessing the reasonableness of the [State court]'s decision.") (emphasis added).

107

That the majority relies principally on our cases, rather than those of the Supreme Court, underscores how little basis the majority has for not deferring to the State court's decision, as AEDPA requires.

A.

Regarding evidence of DeBruce's gastrointestinal problems, the District Court concluded, with some understatement, that the claim "does not require extensive analysis." DeBruce, No. 04-2669, ECF Doc. 31, at 61. It is hard to imagine that the jury, having just convicted DeBruce of a cold-blooded murder, would be inclined to give him a pass because he suffers bad stomach aches. DeBruce's claim here is not that his diagnosis has any bearing on the murder for which he was convicted; it's just a reason to feel sorry for him. The Court of Criminal Appeals was not unreasonable in concluding that this diagnosis would not have changed DeBruce's sentence.

B.

DeBruce's second category of mitigating evidence is that he is not particularly bright. The Court of Criminal Appeals described evidence on this point as "conflicting," DeBruce, 890 So. 2d at 1085, because at the Rule 32 hearing the State's expert disagreed with DeBruce's expert about whether DeBruce has brain damage. On the separate question of DeBruce's IQ, the experts were more closely aligned: the State's expert "had evaluated DeBruce and had

108

conducted several IQ tests and determined that DeBruce's verbal IQ was 84," id. at 1084, but agreed on cross-examination that "scores in the 70s are consistent, and it would be consistent also with my observations of him," State Court—Collateral Transcript, Vol. 15, at 240.  At the Rule 32 hearing, then, there were two issues in play: whether DeBruce had brain damage, and whether DeBruce had a low-to-average IQ.  The Court of Criminal Appeals believed evidence on the first issue was inconclusive—the State's expert testified that DeBruce was malingering—and believed that the second issue, standing alone, was not mitigating enough to warrant a different sentence.

The majority says that the court was unreasonable because the inconsistency in the expert testimony "favors DeBruce."  Maj. Op. at 29.  I cannot imagine what the majority means by that, because I cannot imagine how testimony that DeBruce "suffers from no serious mental illness or mental defect" and was "malingering psychological psychiatric symptoms" could possibly "favor" him.  The word I would use is "rebut," as in: "To rebut DeBruce's evidence, the State offered the testimony of its own expert at the postconviction hearing."  DeBruce, 890 So. 2d at 1084.  That expert "said that it was his opinion that DeBruce was not mentally

retarded but was malingering." Id. [7]  If that kind of testimony "favors" the petitioner, what would damaging testimony look like?

The majority simply disagrees with the Court of Criminal Appeals about the weight of DeBruce's IQ scores, and conflates that disagreement with AEDPA's reasonableness determination.  The majority accuses the State court of "discounting" evidence of DeBruce's "mental impairments," Maj. Op. at 28, but the court did no such thing:

> As directed by the Supreme Court in Wiggins, we have reweighed the omitted mitigating evidence—evidence indicating that DeBruce had Crohn's disease and conflicting evidence of DeBruce's mental health—against the aggravating circumstances that were proven in this case—the fact that the murder was committed during a robbery and the fact that DeBruce had previously been convicted of a crime of violence.  Given the aggravating circumstances presented here and the cold blooded manner in which the killing occurred, we believe that DeBruce's death sentence was appropriate.

DeBruce, 890 So. 2d at 1093 (emphasis added).  The court did not "discount" DeBruce's mental health argument; they considered it and, in light of testimony that DeBruce "suffers from no serious mental illness or mental defect" and was "malingering psychological and psychiatric symptoms," the court accurately characterized the evidence as "conflicting."  See State Court—Collateral

---

[7] The majority stresses that the State expert testified that DeBruce "was giving reasonable effort" during his evaluation.  Maj. Op. at 29 (quoting State Court—Collateral Transcript, Vol. 16, at 236).  And that is true.  What the majority leaves out is that Dr. King was responding to a question about whether he felt "that [DeBruce] was putting forth maximum effort."  State Court—Collateral Transcript, Vol. 16, at 236 (emphasis added).  "Reasonable effort" looks less impressive in context, so the majority just omits the context.

110

Transcript, Vol. 15 at 231, 237.  The majority, obviously, would read the transcript more favorably for DeBruce, but that is not the question under AEDPA.  Section 2254 asks whether it was unreasonable for the State court to find as it did.  See Pinholster, __ U.S. at __, 131 S. Ct. at 1411.  The Court of Criminal Appeals was not unreasonable for believing that DeBruce would not benefit from a battle of the experts over his mental health.

C.

The final category of mitigating evidence concerns DeBruce's background and upbringing, which the majority says was "heavily disadvantaged."  Maj. Op. at 21.  Most of this evidence is drawn from the testimony of two of DeBruce's sisters, Linda and Jacqueline DeBruce, who were both in jail at the time of the Rule 32 hearing.  The sisters' testimony suggests that the DeBruce children grew up poor in a bad neighborhood.  Their father "just went to work, came home.  That's about it."  State Court—Collateral Transcript, Vol. 17, at 347.  Their mother "worked the majority of the time."  Id.  And their neighborhood "was like normal housing projects, violence, fighting, stabbing, stuff like that."  Id. at 336.  Jacqueline testified to "occasions where a lot of guys jumped on Derrick, for what reason I don't know," id. at 338, but clarified on cross-examination that "we didn't see it, but we know that he got beaten up because my mother had made a police report on the guys who jumped on Derrick," id. at 354.

111

Some of the sisters' testimony is not mitigating at all, and some of it is of only debatable usefulness to DeBruce. When asked whether the sibling she grew up with had any mental problems, the best Jacqueline DeBruce could come up with was an anecdote about DeBruce forgetting to buy bread at the grocery store. Id. at 343. Likewise, she recalled that the eldest DeBruce child, Juanita, would discipline DeBruce by withholding his favorite foods, "because he really liked to eat what he wanted to eat." Id. at 347.

The majority makes much of "the daily beatings that DeBruce suffered as a child at the hands of his older sister [Juanita]." Maj. Op. at 26. These "daily beatings" sound more like spankings in Jacqueline's telling—"[Juanita] used to whoop him all the time. . . . [S]he used to whoop him with extension cords, switches and twist them together." State Court—Collateral Transcript, Vol. 15, at 347—and it seems odd that this supposed sadist would also be the sibling most invested in helping DeBruce with his homework: "[Juanita] used to try to help him, or we used to have to help him also, but she used to like be a little hard on him because he told her that he didn't know how to do it, and she wanted to instill in his head that he know how to do it. She used to make him do it." Id. at 348. Indeed, at several points Jacqueline testified that the DeBruce children were close-knit and looked out for one another: "I used to have to dress him and tie his shoes.

112

I used to have to go to the classroom door and get him all the time when the rest of us used to meet up together somewhere." Id. at 342.

The majority says that all this "is the kind of troubled history that the [Supreme] Court has 'declared relevant to assessing a defendant's moral culpability,'" Maj. Op. at 21 (quoting Wiggins, 539 U.S. at 535, 123 S. Ct. at 2542), but the majority is careful not to go into much detail about the troubled histories actually described in cases like Porter, Wiggins, and Williams, because— as the District Court recognized—"DeBruce's childhood . . . pales in comparison to the nightmarish childhoods experienced by the petitioners in the line of Supreme Court cases he relies upon to support a prejudice argument." DeBruce, No. 04-2669, ECF Doc. 31, at 66. DeBruce did not "routinely witness[] his father beat his mother, one time so severely that she had to go to the hospital and lost a child." Porter, 558 U.S. at 33, 130 S. Ct. at 449. His father never tried to shoot him. Id. His parents did not "frequently [leave him] and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage." Wiggins, 539 U.S. at 516–17, 123 S. Ct. at 2533. His mother did not have "sex with men while her children slept in the same bed" or "force[] [his] hand against a hot stove burner." Id. at 517, 123 S. Ct. at 2533. DeBruce was not "repeatedly molested and raped" by a foster parent. Id. He was not "gang-raped . . . on more than one occasion" or "sexually abused by his supervisor" at work. Id. His parents were

113

not "imprisoned for the criminal neglect" of their children, Williams, 529 U.S. at 395. 120 S. Ct. at 1514, nor did DeBruce grow up in a house with "several places on the floor where someone had had a bowel movement," where "[u]rine was standing in several places in the bedrooms," where "it was impossible to step any place on the kitchen floor where there was no trash," or where "[t]he children had to be put in [the hospital], as four of them . . . were definitely under the influence of whiskey." Id. at n.19. "DeBruce's childhood simply does not carry with it the same horrors as these cases. Nor are there any hospital, social services or school records that corroborate [Jaqueline] DeBruce's contention that DeBruce was physically and emotionally abused, malnourished or suffered from black outs or seizures." DeBruce, No. 04-2669, ECF Doc. 31, at 67. In sum, DeBruce's case looks nothing like the cases on which he and the majority rely. Compared side-by-side with those cases, his prejudice argument is weak.

The majority also ignores the possibility that extended testimony about DeBruce's background would have been more hurtful than helpful. See Wong, 558 U.S. at 25, 130 S. Ct. at 389 ("A heavyhanded case to portray [the petitioner] in a positive light . . . would have invited the strongest possible evidence in rebuttal."). The humanizing strategy the majority now advocates "would have put into play aspects of [petitioner's] character that would have triggered admission of" rebuttal evidence. Id. at 22, 130 S. Ct. at 387–88. For instance, claims about

114

DeBruce's "resistance to joining gangs," Maj. Op. at 20, would obviously open the door to testimony about DeBruce's participation in numerous robberies as part of a criminal gang, including the attempted armed robbery of the Sylacauga bank that Mathis had lobbied so vigorously to exclude in the guilt phase of the trial.

Indeed, following DeBruce's mother's testimony at the penalty phase of trial, the prosecutor expressed frustration at not being allowed to rebut her testimony: "I'm sitting back with witnesses for rebuttal." State Court—Trial Transcript, Vol. 7, at 1144. The prosecutor also wanted to call Gary Garner: "The issue [of mental health] is interjected, Judge. You've got the defendant saying [in the Garner Report] that he denies any prior mental health treatment or psychiatric hospitalization, and that's in direct conflict to the testimony [of DeBruce's mother] they put on." Id. at 1151.

The defense lawyers objected. DelGrosso argued that the prosecutor "had every opportunity in the world during the course of this trial to introduce this defendant's statement, and he didn't do it. Now he's trying to put on evidence that he didn't put on in his case in chief and it is not in rebuttal to anything that [DeBruce's mother] said." Id. at 1148. "I don't think we can go into any of it. [The prosecutor] is talking about putting [Garner] on to testify about statements that [DeBruce] made to impeach [Jessie DeBruce] . . . [the prosecutor] can't impeach her by saying what [DeBruce] said as far as hearsay goes." Id. at 1150.

There is some irony in the fact that DeBruce's lawyers worked so hard to exclude the testimony that DeBruce now, in hindsight, calls mitigating.

It also is not obvious that a greater focus on the DeBruce household would have been helpful. For one thing, "some of the new testimony would likely have undercut the mitigating value of the testimony by [petitioner's] mother." Pinholster, __ U.S. at __, 131 S. Ct. at 1410. Jacqueline DeBruce testified that DeBruce's mother was aware of the supposedly heinous abuse Juanita was inflicting on the children: "My mother said she left [Juanita] in control over us and she can chastise us as she choose." State Court—Collateral Transcript, Vol. 15, at 355. Additionally, a focus on the DeBruce family could draw lingering attention to the other DeBruce siblings' legal problems; Mathis tried to blunt this in his direct examination of DeBruce's mother by acknowledging that most of the DeBruce sons either were, or had been, in prison. See State Court—Trial Transcript, Vol. 7, at 1127–29. It is not clear how a sustained focus on the DeBruce family would have helped DeBruce. See Pinholster, __ U.S. at __, 131 S. Ct. at 1410 ("The new evidence relating to [petitioner's] family . . . is also by no means clearly mitigating, as the jury might have concluded that [petitioner] was simply beyond rehabilitation.").

In any case, the Alabama Court of Criminal Appeals considered all of the evidence—the old and the new, the good and the bad—and determined that none

116

of the new mitigating evidence was weighty enough to show a "substantial" likelihood of a different sentence. See Harrington, __ U.S. at __, 131 S. Ct. at 792. They were right. Stripped of rhetorical embellishment, DeBruce's new evidence is simply not the harrowing stuff of cases like Porter, Wiggins, or Williams. Some of it might have even backfired and opened the door to additional damaging testimony. The majority is wrong to find prejudice here, but it is especially wrong to set aside the State court's contrary judgment simply because the majority feels differently.

## V.

While I join the majority in concluding that DeBruce failed to prove that his lawyers were ineffective in the guilt phase of his trial, I would reject his claim that his lawyers were ineffective in the penalty phase. DeBruce had the responsibility—and opportunity—to prove that his lawyers were genuinely unaware of his background at trial. DeBruce responded with speculation and bluster. Because that is not enough to warrant habeas relief, I respectfully dissent.

117